UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KLINE HILL PARTNERS FUND II LP<br><br>                    Plaintiff,<br><br>v.<br><br>HRH KHALED BIN SULTAN ABDULAZIZ AL SAUD, A SAUDI INDIVIDUAL, AND THE ESTATE OF THE LATE HRH PRINCESS M.B.A.B.M.A.S., ACTING THROUGH HRH PRINCE KHALED BIN SULTAN ABDULAZIZ AL SAUD, and DECISIVE WEALTH, S.A.<br><br>                    Defendants | Civil Action No. _____<br><br><br><br><br><br><br><br><br><br><br><br>MARCH 13, 2020 |

## VERIFIED COMPLAINT

This action is to recover $408,822 that a member of the Saudi royal family overcharged a Greenwich investment firm for private-equity securities.  Plaintiff Kline Hill Partners Fund II LP ("Kline Hill") was the buyer of limited partnership interests owned by Defendant His Royal Highness, Prince Khaled Bin Sultan Abdulaziz Al Saud ("Prince Khaled").  The Prince owned half of his interests in his own name and the other half as administrator of the estate of a deceased member of the Saudi royal family.  The parties' purchase and sale agreement, executed a month before delivery of the Prince's interests, established a procedure for valuing the interests at closing, which procedure accounted for capital contributions and distributions prior to sale. The purchase and sale agreement also required the seller to notify buyer, at least three days prior to closing, of any corrections to the calculation of the purchase price.  The purpose of these provisions was to avoid any overcharge by the seller of or underpayment by the buyer.

Defendant Decisive Wealth S.A. ("Decisive") served as Prince Khaled's manager in the transaction and sent the Prince's pre-closing notice to Kline Hill.  The pre-closing notice failed to disclose distributions of $408,822 to Prince Khaled and thereby overstated Kline Hill's purchase price by the same amount.  Kline Hill paid the overstated price by wiring funds, as Decisive instructed, to three Swiss accounts – one in the Prince's name individually, another in his name as estate administrator, and a third in the name of Decisive.  Kline Hill was unable to discover the overcharge until after it took delivery of the Prince's interests.  The purchase and sale agreement accounted for such an event by requiring the parties to correct for overcharges or underpayments discovered after closing.  Kline Hill has politely and repeatedly asked to be repaid.  Prince Khaled and Decisive have failed and refused to do so.

## PARTIES

1.      Plaintiff Kline Hill Partners Fund II LP ("Kline Hill") is a Delaware limited partnership with a principal place of business in Greenwich, Connecticut.

2.      Defendant His Royal Highness, Prince Khaled Bin Sultan Abdulaziz Al Saud (referred to herein as "Prince Khaled," "His Royal Highness," or "the Prince"), is an individual residing, on information and belief, in the Kingdom of Saudi Arabia.

3.      Defendant His Royal Highness, Prince Khaled Bin Sultan Abdulaziz Al Saud, as an administrator of the Estate of the late HRH Princess M.B.A.B.M.A.S., is an individual residing, on information and belief, in the Kingdom of Saudi Arabia.

4.      Defendant Decisive Wealth S.A. ("Decisive") is a private wealth management firm organized in Switzerland with a principal place of business in Geneva, Switzerland.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(2) as there is complete diversity of citizenship and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

6.      The Court has personal jurisdiction pursuant to Conn. Gen. Stat. sec. 52-59b.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

### A.   *The Beginning of the Relationship and the Letter of Intent.*

8.      In February 2018, Bernard Abdo ("Abdo") was a securities broker working in New York, New York.  Among his clients was Prince Khaled.

9.      On February 23, 2018, Abdo e-mailed Kline Hill seeking "a bid for the following private equity fund positions. These are held in a Swiss Private bank account."  The first of the "positions" was "USD 10 Mio commitment in secondary opportunity fund 3…."  *See* E-mail of Bernard Abdo dated February 23, 2018, a true and correct copy of which is attached hereto as Exhibit A.

10.     The "secondary opportunity fund 3" to which Abdo referred was the Secondary Opportunities Fund III Private Client Feeder Fund, L.P. (the "Secondary Opportunities Fund"). The "USD 10 Mio" position was the sum of two five million dollar positions that Prince Khaled owned.

11.     These two positions, one of which the Prince owned individually, the other as administrator of the Estate of the late HRH Princess M.B.A.B.M.A.S., are the subject of the captioned action.

12.     Kline Hill bid for the two "positions." Negotiations ensued, culminating in the execution on or about April 12, 2018, of a letter of intent for the sale of the Prince's interests ("LOI"), a true and correct copy of which is attached hereto as Exhibit B.  The LOI was signed by both a Kline Hill representative and by Prince Khaled.  Kline Hill delivered the LOI to Abdo, the Prince's broker.  The LOI bears a Singapore address for Abdo because Abdo was registered there as a broker.  At the time of this conduct alleged herein, however, Abdo was located in Manhattan.

**B.    *The Agreement for Purchase and Sale; Calculation of Kline Hill's Purchase Price.***

13.     Kline Hill, Prince Khaled in his individual capacity, and Prince Khaled in his administrative capacity are parties to an Agreement for Purchase and Sale (the "Agreement") dated April 27, 2018, a true and correct copy of which is attached hereto as Exhibit C.

14.     The Agreement names Prince Khaled in each capacity as a "Seller" and Kline Hill as "the Buyer."  *See* Ex. C at p. 1.

15.     The Agreement denominates the subject property of the purchase and sale transaction as Prince Khaled's "Interests," and defines the Interests as "the limited partnership interests in the Partnerships owned by each Seller and set forth on Schedule 1."

16.     The Agreement's Schedule 1, in turn, identifies the Interests as limited partnership interests in the Secondary Opportunities Fund III Private Client Feeder Fund, L.P. (the "Secondary Opportunities Fund"), each of which interests is represented by a capital commitment of five million dollars.  *See* Ex. C Schedule 1.

17.     The Agreement's section 3 sets forth the parties' rights and obligations at closing. Sellers were to deliver to Buyer their Interests in the form of "all applicable executed Assignment and Assumption Agreements and other Additional Seller's Documents pursuant to

4

which such Seller shall convey the Interests it is transferring to Buyer…," along with other materials necessary for Buyer to document its ownership of the Interests upon consummation of the purchase and sale.  *See* Ex. C at sec. 3(d).

18.     Buyer was required to deliver to Seller "the Allocated Portion of the Purchase Price relating to the Interests being transferred by such Seller, subject to adjustment in accordance with Section 4 and net of any withholding taxes attributable to the transfer or sale of the Interests[.]"  *See* Ex. C at sec. 3(c).

19.     The calculation of Kline Hill's purchase price for the Prince's interests began with the "Allocated Portion of the Purchase Price," a term defined in the Agreement and represented numerically on Schedule 1.  The purchase price at closing would be the Allocated Portion of the Purchase Price as increased by the Seller's capital contributions and as reduced by distributions after the Cut Off Date.   *See* Ex. C at sec. 4.

20.     According to Schedule 1, the Allocated Portion of the Purchase Price for the interest that Prince Khaled owned individually was $1,850,000.  The Allocated Portion of the Purchase Price for the interest that Prince Khaled owned as estate administrator was also stated as $1,850,000.  *See* Ex. C at Schedule 1.

21.     The "adjustment in accordance with Section 4" includes a reduction in the Allocated Portion of the Purchase Price "equal to the sum of all Distributions with respect to such interests after the Cut Off Date."  *See* Ex. C at sec. 4.  The Agreement defines the "Cut Off Date" as September 30, 2017.  *Id*. at p. 2.

22.     According to Schedule 1, for interests that he owned in each capacity, the Prince received Distributions after the Cut Off Date in the amount of $424,089.  Also according to Schedule 1, for interests that he owned in each capacity, the Prince had Funded Capital

5

Commitments After the Cut Off Date in the amount of $1,469,936.  By subtracting the

distributions and adding the capital contributions to the Allocated Portion of the Purchase Price,

Schedule 1 to the Agreement set forth a "Net Purchase Price Allocation" in the amount of

$2,895,847 as the price that Kline Hill was to pay at closing for the interest that the Prince owned

in each capacity.  The total Net Purchase Price Allocation was thus $5,791,694 ($2,895,847 for

the Prince's individual interest and $2,895,847 for his interest as administrator.)  This figure

assumed no additional distributions or capital contributions prior to closing.

23.     Prince Khaled, directly or through his agents, transmitted to Kline Hill, by

electronic or telephonic means, the figures that appear in Schedule 1 for "Allocated Portion of

the Purchase Price," Distributions After Cut Off Date," and "Net Purchase Price Allocation."

24.     Schedule 1 acknowledged that the $5,791,694 Net Purchase Price Allocation was

to be "confirmed prior to [the] Closing Date."  *See* <u>Ex. C</u> Schedule 1.

25.     The Agreement's section 3(b) required that:

> At least three (3) business days prior to each Closing, each applicable Seller shall
> deliver to Buyer a notice (a "***Pre-Closing Notice***") (i) specifying the Closing Date,
> and (ii) setting forth the Interest(s) to be transferred by such Seller on such Closing
> Date and the calculation of the applicable Allocated Portion of the Purchase Price
> of the Interest(s) to be transferred by such Seller on such Closing Date, including
> the aggregate amount of all Funded Capital Commitments and Distributions
> included in such determination as set forth in Section 4.

*See* <u>Ex. C</u> at sec. 3(b) (emphasis in original).  In other words, three days prior to closing, a

Seller that had received distributions after September 30, 2017 had to so notify the Buyer,

so that the Buyer could reduce his purchase prince by the amount of distributions that the

Seller had taken.  Schedule 1 accounted for $848,178 of such distributions. *See* <u>Ex. C</u> at

Schedule 1.

6

### C.  *The Agreement's Warranties, Covenants, and Indemnification Provisions.*

26.     The Agreement also: (a) set forth Buyer's and Seller's representations and

warranties; (b) contained covenants of cooperation and regarding certain matters pending final

closing; and (c) contained indemnification provisions.

27.     Among Prince Khaled's warranties was that Schedule 1 truly and accurately

reflected "the Purchase Price Allocation for each Interest as of the Closing Date [and] the date

and value of all Distributions received by [the Prince] with respect to the Interests after the Cut

Off Date and on or prior to the Closing Date."  *See* Ex. C at 5(h).  This warranty survives the

closing for a period of two years.  *Id*. at sec. 10.

28.     The Agreement's covenant of cooperation required both Buyer and Sellers to

"cooperate fully with each other in furnishing information or performing any action reasonably

requested by the other party, which information or action is necessary to a timely and successful

consummation of the transactions contemplated by this Agreement."  *Id*. at sec. 7(a).

29.     The Sellers' indemnification covers claims or losses arising out of "any

inaccuracy in breach of any representation or warranty of such Seller contained in this

Agreement" and allows for the Buyer's recovery from Sellers of "any reasonable legal or other

expenses" arising out of such breach.  *Id*. at sec. 11(a).

### D.  *Involvement of Decisive Wealth S.A.; Undisclosed Distributions to Prince Khaled.*

30.     Defendant Decisive Wealth S.A. ("Decisive") served as Prince Khaled's

investment manager in connection with the Agreement.

31.     On May 7, 2018, Abdo e-mailed Kline Hill and Decisive's Elie Chamat

("Chamat") and Maryam Hakimi ("Hakimi'), along with two representatives of Institutional

Capital Network, Inc., which does business as "iCapital Network," and which serves as a manager for the Secondary Opportunities Fund.  *See* E-mail of Bernard Abdo, dated May 7, 2018, a true and correct copy of which is attached hereto as <u>Exhibit D</u>.  Abdo's message to "All" was "can we pls have a call w seller's advisor today pls re the SOFIII share transfer."  *Id*. Decisive was the "seller's advisor" – that is, Prince Khaled's advisor – to whom Abdo referred. *Id*.  "SOFIII" was Abdo's shorthand for the Secondary Opportunities Fund.  *Id*.  This e-mail served as Abdo's introduction of Kline Hill to Decisive.

32.     On the Prince's behalf, Decisive delivered a Pre-Closing Notice to Kline Hill on or about May 29, 2018.  A true and correct copy of the Pre-Closing Notice is attached hereto as <u>Exhibit E</u>.  Its figures for "Allocated Portion of the Purchase Price," Distributions After Cut Off Date," and "Net Purchase Price Allocation" are identical those set forth in the Agreement's Schedule 1.  In other words, the Pre-Closing Notice, like Schedule 1 itself, misrepresented that Prince Khaled had received no distributions after the Cut Off Date other than the $848,178 shown on Schedule 1.

33.     In an asterisk notation, the Pre-Closing Notice acknowledged that, prior to closing, Kline Hill had paid $2,500 of each Seller's share of Partnership expenses, and that Kline Hill's purchase price for each Seller's Interest should accordingly be reduced by that amount.  So reduced, the purchase price for each Seller's Interest was $2,893,347, and for both, $5,786,694. *See* <u>Ex. E</u>.

34.     Neither Schedule 1 nor the Pre-Closing Notice disclosed that on or about March 22, 2018, the Secondary Opportunities Fund made distributions of $408,822 to Prince Khaled. This figure was the sum of two separate distributions to His Royal Highness, each in the amount of $204,411, one to him as an individual owner and the other in his administrative capacity.

Both distributions occurred after the Cut Off Date of September 30, 2017. The Agreement required that these distributions be disclosed and reflected in the purchase price. Kline Hill had no knowledge of these distributions when it signed the Agreement or when it received the Pre-Closing Notice.

35.    The parties to the Agreement scheduled May 31, 2018, as their closing date.

36.    Decisive directed Kline Hill, by e-mail, to wire its $5,786,694 purchase money as follows: $2,250,000 to an account at Deutsche Bank, Geneva, Switzerland, in the name of the Estate of the late HRH Princess M.B.A.B.M.A.S.; $2,250,000 to an account at Deutsche Bank, Geneva, Switzerland, in the name of HR Khaled Bin Sultan Abdulaziz Al Saud; and $1,286,694 to an account at Barclays Bank (Suisse) S.A., also in Geneva, in the name of the Decisive Wealth S.A.

37.    Kline Hill wired funds to the accounts and in the amounts that Decisive instructed. True and correct copies of Kline Hill's wire confirmations (with account numbers redacted) are attached hereto as Exhibit F.

38.    Part of Kline Hill's payment was delayed several days because Decisive initially sent Kline Hill incorrect wire instructions. Decisive corrected the instructions, and Kline Hill complied with the corrected instructions. The net effect of this mix-up was to delay the transaction by about a week.

### E.  Kline Hill Discovers the Overcharge; Decisive and the Prince Refuse to Correct It.

39.    Kline Hill received Prince Khaled's interests in June 2018. Only then was it able to discover that the Secondary Opportunities Fund had made two distributions, each in the amount of $204,411, to Prince Khaled that the Prince and Decisive had failed to disclose. One distribution was to the Prince as an individual owner of an interest in the Secondary

Opportunities Fund and the other to his ownership as administrator of the Estate of the late HRH Princess M.B.A.B.M.A.S.

40.     Had these distributions been factored into the Allocated Portion of the Purchase Price, Kline Hill would have paid $408,822 less for the Prince's Interests than it paid at closing.

41.     The Agreement provided a mechanism for correcting any overcharge by Seller or underpayment by Buyer in the event that, post-closing, a party discovered itself to have paid too much or received too little.  Specifically, section 4 states in relevant part that, "[t]o the extent the parties discover after the Closing that the amount of Funded Capital Commitments and/or Distributions used in adjusting the Allocated Portion of the Purchase Price for an Interest was incorrect, such Allocated Portion of the Purchase Price will be appropriately adjusted to take into account the actual Funded Capital Commitments and/or Distributions in respect of such Interest (and the parties shall cooperate as necessary to correct the error)."  *See* Ex. C at sec. 4.

42.     Section 4 further provided that "[a]ny disagreement as to the calculation of any Funded Capital Commitments and Distributions used to determine the Allocated Portion of the Purchase Price shall be subject to confirmation by the Manager of the Partnership of the calculation of such Funded Capital Commitments and Distributions."  *Id*.  The "Manager" to whom section 4 referred was, with respect to any partnership whose issued interest was being bought and sold, "the general partner, investment manager, or other Person or entity which controls the Partnership."  *Id*.

43.     iCapital Network served as the Secondary Opportunities Fund's "Manager" within the meaning of the Agreement's section 4.  On August 6, 2019, Kline Hill sought from iCapital Network a reconciliation of cash flows relating to the interests it has purchased.  *See*

Kline Hill e-mail dated August 6, 2019, a true and correct copy of which is attached hereto as Exhibit G.

44.     On August 14, 2019, iCapital Network responded with the requested reconciliation (the "Reconciliation").  *See* iCapital Network e-mail dated August 14, 2019, a true and correct copy of which is attached hereto as Exhibit H.  The Reconciliation reflected distributions to Prince Khaled in the amount of $424,089 as owner of interests in the Secondary Opportunities Fund, both as an individual and as administrator for the estate of Her Royal Highness Princess M.B.A.B.M.A.S.  These distributions were accurately stated in both Schedule 1 to the Agreement and in the Prince's Pre-Closing Notice.

45.     The Reconciliation also revealed that, eight days prior to closing on the Agreement, the Prince had received distributions in the amount of $204,411 in each of his individual and administrative capacities.  *See* Reconciliation at Ex. H (showing distributions on March 22, 2018 to "KHU1" and to "KHU2," each in the amount of $204,411.00).  Neither the Agreement's Schedule 1 nor the Prince's Pre-Closing Notice disclosed these distributions, the sum of which is $408,822.  The Prince had received these distributions after the Cut Off Date (September 30, 2017) and before issuing his Pre-Closing Notice (on or about May 29, 2018).

46.     On August 15, 2019, Kline Hill e-mailed Decisive concerning the Prince's overcharge.  Kline Hill attached the Reconciliation to its e-mail.  *See* Kline Hill- Decisive e-mail chain, at Kline Hill e-mail dated August 15, 2019, a true and correct copy of which is attached hereto at Exhibit I.

47.     Decisive's Hakimi replied on August 16, 2019, referring to the overcharge as "an anomaly in the proceedings," and acknowledging that "[f]or our part we are of course obliged to

11

cross-check and query the reckoning which has led you to this conclusion." *Id.* at Decisive e-mail dated August 16, 2019.

48.     In September, October, November, and December 2019, and in January and February 2020, Kline Hill wrote to Decisive seeking repayment.  Kline Hill and Decisive also spoke several times over the telephone.  *See generally id.*

49.     Neither Decisive nor Prince Khaled has repaid the overcharge or acknowledged Kline Hill's right to repayment.

50.     Defendants' conduct alleged herein constitutes a transaction of business in the state of Connecticut.  Both Prince Khaled and Decisive expect or reasonably should expect that their acts alleged herein have consequences in the state of Connecticut and derive substantial revenue from interstate or international commerce.  On information and belief, Decisive regularly does or solicits business or engages in a persistent course of business conduct in the state of Connecticut.

## COUNT 1
### (Breach of Contract vs. Prince Khaled)

51.     Kline Hill incorporates the foregoing allegations as if expressly restated.

52.     The Agreement is an enforceable contract.

53.     Prince Khaled breached the Agreement by, without limitation: (a) failing to disclose the distributions in the amount of $408,822 that he received after the Cut Off Date; and (b) failing and refusing to comply with the Agreement's provisions calling for an adjustment of Kline Hill's purchase price.

54.     As a result, Kline Hill has suffered contract damages, exclusive of interest and exclusive of attorneys' fees, in the amount of $408,822.

12

## COUNT 2
### (Breach of Warranty and Breach of Covenant vs. Prince Khaled)

55.    Kline Hill incorporates the foregoing allegations as if expressly restated.

56.    The Agreement contains Prince Khaled's warranty that Schedule 1 truly and accurately set forth "the Purchase Price Allocation for each Interest as of the Closing Date [and] the date and value of all Distributions received by [the Prince] with respect to the Interests after the Cut Off Date and on or prior to the Closing Date."

57.    Schedule 1 falsely stated both "the Purchase Price Allocation for each Interest as of the Closing Date [and] the date and value of all Distributions received by [the Prince] with respect to the Interests after the Cut Off Date and on or prior to the Closing Date."

58.    As expressly stated at section 2 of the Agreement, Kline Hill relied on the Prince's representations and warranties.

59.    The Prince's false representations constitute a breach of his warranties to Kline Hill.

60.    Said breach of warranty was deliberate or willful.

61.    Prince Khaled covenanted to "cooperate fully with [Kline Hill] in furnishing information or performing any action reasonably requested by [Kline Hill], which information or action is necessary to a timely and successful consummation of the transactions contemplated by this Agreement." *Id*. at sec. 7(a).

62.    By the acts and material omissions alleged herein, the Prince breached his contractual covenants to Kline Hill.

63.    Prince Khaled's breaches require him to indemnify Kline Hill.

64.    The Prince's breaches have caused Kline Hill damages including without

13

limitation the following: (a) $408,822 in damages in the form of an overpayment for the Prince's

interests; (b) reasonable attorney's fees and expenses in an amount no less than $7,500.

## COUNT 3
### (Misrepresentation vs. Decisive)

65.     Kline Hill incorporates the foregoing allegations as if expressly restated.

66.     By its conduct alleged herein, Decisive misrepresented the facts concerning the

price that Kline Hill was to pay for Prince Khaled's interests.  In particular, Decisive

misrepresented the amount of distributions to Prince Khaled that the Secondary Opportunities

Fund had made after the Cut Off Date.

67.     Decisive's misrepresentations were knowing, willful, and deliberate.  In the event

that Decisive's misrepresentations were negligent, Decisive knowingly, willfully, and

deliberately failed and refused to correct them and to repay Kline Hill the amount that it was

overcharged.

68.     Kline Hill relied on Decisive's misrepresentations in purchasing the Prince's

interests, and it has been damages in the amount of $408,822.

## COUNT 4
### (Unjust Enrichment vs. Both Defendants)

69.     Kline Hill incorporates the foregoing allegations as if expressly restated.

70.     Based on the representations and instructions of Prince Khaled and Decisive,

Kline Hill wired $2,250,000 to the Prince individually, $2,250,000 to the Prince as administrator

of the Estate of the late HRH Princess M.B.A.B.M.A.S., and $1,286,694 to Decisive.

71.     Each of the three Defendants have been unjustly enriched in an amount exceeding

the $408,822 that Kline Hill was overcharged.

72.     Equity and good conscience require that any or all of the Defendants repay Kline

Hill the amount of $408,822, by which they were unjustly enriched.

## PRAYERS FOR RELIEF

**WHEREFORE**, Kline Hill hereby request that this Court issue a judgment:

A.  Against Prince Khaled awarding Kline Hill, on Count 1 of this Complaint, its actual damages in the amount of $408,822;

B.  Against Prince Khaled awarding Kline Hill, on Count 2 of this Complaint, the aforesaid money damages along with Kline Hill's reasonable attorneys' fees and expenses in an amount no less than $7,500;

C.  Against Decisive awarding Kline Hill, on Count 3 of this Complaint, damages of $408,822;

D.  Against either or both Defendants awarding Kline Hill, on Count 4 of this Complaint, restitution of $408,822.

E.  Awarding Kline Hill such other and further relief to which it may be entitled.


Respectfully submitted,

KLINE HILL PARTNERS FUND II LP

By its attorneys,

/s/ Calvin K. Woo
Calvin K. Woo
Federal Bar No. ct24497
VERRILL DANA LLP
355 Riverside Avenue
P.O. Box 5116
Westport, CT  06881
Tel:  (203) 222-0885
Fax:  (203) 226-8025
cwoo@verrill-law.com

- and -

16

Daniel J. Dwyer
*Pro Hac Vice forthcoming*
VERRILL DANA LLP
One Federal Street, 20st Floor
Boston, MA 02110
ddwyer@verrill-law.com
Tel.: (617) 309-2622
Fax: (617) 309-2601
ddwyer@verrill-law.com

## VERIFICATION

I am a citizen of the United States of America and a Member of KHP Fund GP II LLC, General Partner of Kline Hill Partners Fund II LP.  I have reviewed the foregoing Verified Complaint.  The facts contained therein are true and correct on the basis of my personal knowledge and the books and records available to me, and otherwise are true to the best of my information and belief.  I make this verification under penalties of perjury.

March 13, 2020

DocuSigned by:

*Thomas Melly*

Thomas Melly

13626905_1