# **Exhibit 1**

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

AGREEMENT OF PURCHASE AND SALE

This Agreement of Purchase and Sale, dated as of April 27, 2018 (this "*Agreement*"), is among Kline Hill Partners Fund II LP, a Delaware limited partnership ("*Buyer*"), and HRH Khaled Bin Sultan Bin Abdulaziz Al Saud, a Saudi individual, and Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled, a Saudi individual (each a "*Seller*" and, together, the "*Sellers*").

**WITNESSETH:**

WHEREAS, Sellers own the Portfolio Property (as hereinafter defined); and

WHEREAS, Buyer desires to purchase from Sellers, and Sellers desire to sell to Buyer, the Portfolio Property, upon the terms and subject to the conditions set forth in this Purchase Agreement.

NOW THEREFORE, in consideration of the mutual agreements, covenants, representations, warranties and indemnities contained in this Purchase Agreement, Buyer and Sellers agree as follows:

1. **Definitions.**

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"*Act*" shall mean the Securities Act of 1933, as amended.

"*Additional Buyer's Documents*" shall mean the documents and instruments executed and delivered by Buyer to a Seller, Manager or Partnership pursuant to this Agreement.

"*Additional Seller's Documents*" shall mean the documents and instruments executed and delivered by a Seller to Buyer, a Manager or a Partnership pursuant to this Agreement.

"*AIV*" shall mean an alternative investment vehicle or similar partnership or other investment entity in which a Seller has an interest, established pursuant to a Portfolio Property Agreement to make one or more investments in lieu of such investment being made by the applicable Partnership.

"*Allocated Portion of the Purchase Price*" shall have the meaning set forth in Section 4(a).

"*Approvals*" shall mean all notices, legal opinions, consents, amendments, waivers and modifications required pursuant to the terms of any of the Portfolio Property Agreements or such other documents in order to permit (i) consummation of the transactions contemplated by this Agreement and (ii) exchange of the Interests for interests in, and admission of Buyer to, the master fund(s) associated with the Interests, and shall include, without limitation, with respect to the transfer of the Interests by Sellers to Buyer, waivers of (or the expiration, without exercise, of all applicable periods with respect to) all prohibitions on transfer, rights of first refusal, co-sale rights

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

or similar rights, and all required consents (if any) by the Managers to the transfer of such Interests to Buyer and the admission of Buyer as a limited partner to each of the Partnerships.

"*Assignment and Assumption Agreement*" shall mean the assignment and assumption agreement, redemption, exchange or other instruments necessary to effect the transfer of the Interests, in a form reasonably acceptable to each applicable Seller and Buyer and as each Partnership or each Manager may reasonably request.

"*Capital Account Balance*" shall mean, with respect to a Seller and each Interest, such Seller's capital account balance in the applicable Partnership as determined by the respective Manager of such Partnership and reported on the financial statements of such Partnership, as of the Cut Off Date, as set forth in Schedule I.

"*Capital Commitment*" shall mean, with respect to a Seller and each Interest, all obligations of the owner of such Interest to make capital contributions to the applicable Partnership (including any Remaining Capital Commitment and/or Funded Capital Commitment with respect to such Partnership, but excluding any obligation to return prior Distributions to such Partnership or other similar obligations, any "recycling provision" and any obligation to recontribute amounts distributed by such Partnership for reinvestment or other similar purpose under the relevant Portfolio Property Agreements) and to pay management fees and other fees and expenses to such Partnership, its Manager or an affiliate thereof.

"*Claims*" shall have the meaning set forth in Section 11(a).

"*Closing*" shall mean the event at which Buyer shall acquire the Portfolio Property and pay the Purchase Price to Sellers pursuant to the allocations set forth on Schedule I, scheduled to take place on the Closing Date for the applicable Portfolio Property.

"*Closing Date*" shall mean any date as may be mutually agreed to by Sellers and Buyer promptly after satisfaction or waiver of all conditions set forth in Section 8 and Section 9. No Closing Date shall occur after the Final Closing Deadline.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended.

"*Cure Period*" shall have the meaning set forth in Section 14(b).

"*Cut Off Date*" shall mean September 30, 2017.

"*Distributions*" shall mean, without duplication, the gross amount of (i) all proceeds and deemed proceeds from the sale, assignment, transfer, conversion, exchange, redemption, exercise, repayment, waiver, release, compromise, settlement or satisfaction of an Interest and (ii) all distributions, dividends, interest and payments of cash, Securities or other property declared, paid, made or deemed paid or made with respect to or in connection with an Interest. The Distributions received after the Cut Off Date, including the date of such Distribution, are set forth in Schedule III. For this purpose, amounts that would otherwise have been distributed to a Seller but for the withholding or deduction of any taxes attributable to such Seller or the Interests shall be treated as having been distributed to such Seller, and the value of all "in-kind" payments, dividends or other

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

non-cash Distributions shall be the value assigned thereto as of the time of any such Distribution by the applicable Manager in accordance with the applicable Portfolio Property Agreement.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Interests**" shall mean the Interests (or any portion thereof) (i) with respect to which the applicable Seller is unable to obtain the necessary Approvals on or prior to the Final Closing Deadline for the sale, assignment and transfer to Buyer of such Interests as contemplated by this Agreement (other than Liquidated Interests); (ii) that the applicable Seller and Buyer have mutually agreed to exclude from the transactions contemplated by this Agreement; (iii) that have been purchased pursuant to a right of first refusal pursuant to any Portfolio Property Agreement or in accordance with any Portfolio Contractual Right; or (iv) that is subject to an order of a court of competent jurisdiction or governmental authority restraining or prohibiting the completion of the sale.

"**Excluded Obligations**" shall mean, with respect to each Interest, (i) any Losses arising under or relating to the breach by a Seller of any Portfolio Property Agreement applicable to such Seller, any Additional Seller's Documents or this Agreement, (ii) any liabilities or obligations which arise, accrue or relate to the period through and including the applicable Closing Date and result from acts or omissions of a Seller (excluding any Remaining Capital Commitment), (iii) any LP Clawback Obligation, (iv) any obligations or liabilities relating to taxes or other governmental fees attributable to the ownership by a Seller of the Interest (including any liabilities for withholding taxes with respect to the transfers contemplated hereunder, Distributions or allocations to such Seller), (v) any liabilities or obligations relating to any Excluded Interest or arising under any Portfolio Property Agreement or Portfolio Contractual Right relating to any Excluded Interest, (vi) any obligation to pay (or make capital contributions in payment of) management fees that are due or accrue in respect of any period prior to the Cut Off Date, or (vii) any liabilities or obligations with respect to the Interests pursuant to agreements other than the Portfolio Property Agreements.

"**Final Closing**" shall mean the Closing at which the last Portfolio Property to be transferred under this Agreement has been transferred.

"**Final Closing Deadline**" shall mean October 4, 2018; provided, however, that with respect to any Interest as to which a Seller has been notified by a Partnership or its Manager that such Partnership will not permit a transfer of all or any portion of the applicable Interest for a specific period of time specifically because such Partnership is seeking to maintain the applicability of a volume based publicly traded partnership safe harbor but will permit a transfer of such Interest or such portion of such Interest thereafter, the Final Closing Deadline for such Interest shall be the date such Partnership permits such transfer.

"**Funded Capital Commitments**" shall mean the amount of the applicable Seller's Remaining Capital Commitment to a Partnership that is attributable to an Interest and that has been paid by such Seller after the Cut Off Date and on or prior to the Closing. Such amounts are set forth on Schedule III.

"**Indemnitee**" shall have the meaning set forth in Section 11(c)(i).

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

"*Indemnitor*" shall have the meaning set forth in Section 11(c)(i).

"*Interests*" shall mean the limited partner interests in the Partnerships owned by each Seller and set forth on Schedule I.

"*Investment Lien*" shall mean any Lien pertaining to the sale, assignment, disposition or transfer of an Interest (including any consents or approvals of transfers, options, rights of first refusal, co-sale and similar rights) arising out of or based on any Portfolio Property Agreement. For purposes of clarification, Investment Lien, does not include any third-party Lien on an Interest with respect to indebtedness incurred by a Manager or a Partnership, regardless of whether or not such Lien arises out of or is based on any Portfolio Property Agreement.

"*liability*" means any debt, liability, commitment or obligation of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including, whether arising out of any contract or tort based on negligence or strict liability).

"*Lien*" shall mean any lien, pledge, claim, security interest, encumbrance, charge, restriction or limitation of any kind, whether arising by agreement, operation of law or otherwise.

"*Liquidated Interest*" shall mean any Interest with respect to a Partnership that has made a final liquidating distribution to its partners prior to being transferred to Buyer pursuant to this Agreement.

"*Losses*" shall have the meaning set forth in Section 11(a).

"*LP Clawback Obligation*" shall mean, with respect to each Interest, any Liabilities relating to such Interest or under the applicable Portfolio Property Agreement arising by operation of any "limited partner clawback," "all partner clawback," capital contribution, or similar obligation to contribute capital or otherwise bear an economic burden (whether such contribution obligation or other economic burden shall be effected by repayment, drawdown, deduction from any capital account, set-off against any subsequent Distribution or otherwise) relating to (i) all or part of a Distribution made or deemed made to a Seller with respect to such Interest on or prior to the Cut Off Date or (ii) any underlying portfolio investment attributable to such Interest that was otherwise realized (including by write-down or write-off), in whole or in part, on or prior to the Cut Off Date, whether or not there was a distribution related to such realization event.

"*Manager*" shall mean, with respect to each Partnership, the general partner, investment adviser, manager or other Person or entity which controls such Partnership.

"*Partnerships*" shall mean the issuers of the Interests as set forth on Schedule I. For the avoidance of doubt, each Partnership shall also include each AIV, parallel vehicle or similar entity through which a Seller has an interest or otherwise participated in any underlying investment of any Partnership.

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

"***Person***" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"***Portfolio Contractual Right***" shall mean any contractual right of a Seller under any of the Portfolio Property Agreements (or otherwise) to the extent relating to the Interests and to the extent such rights are transferable.

"***Portfolio Property***" shall mean all of the Interests and Portfolio Contractual Rights.

"***Portfolio Property Agreement***" shall mean any agreement, instrument and document to which a Seller is a party that governs or regulates the terms of a Seller's ownership of an Interest, including subscription agreements, partnership agreements, side letters and other similar agreements, in each case, as amended, modified or supplemented and in effect from time to time, but excluding any agreement between a Seller and its consultants, agents and employees.

"***Pre-Closing Notice***" shall have the meaning set forth in Section 3(b).

"***Purchase Price***" shall have the meaning set forth in Section 4(a).

"***Remaining Capital Commitment***" shall mean with respect to a Seller and each Partnership, the amount of such Seller's Capital Commitment to such Partnership that remains available for drawdown as of the Cut Off Date. Such amounts are set forth on Schedule I.

"***Securities***" shall have the meaning ascribed to that term in the Act.

"***Third Party Claim***" shall have the meaning ascribed to that term in Section 11(c)(i).

"***Transfer Taxes***" shall mean all sales (including bulk sales), value add, use, transfer (including real property transfers), filing, recording, ad valorem, privilege, documentary, gross receipts, registration, conveyance, excise, license, stamp, duties or similar taxes or fees (other than any fees and expenses of a Manager or Partnership, which shall be governed by Section 16(a)), together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties incurred in connection with any transaction contemplated by this Agreement, but not including any income, capital gains or similar taxes (or withholding taxes with respect thereto).

2.     **Sale and Purchase of the Portfolio Property.**

Subject to the terms and conditions of this Agreement, and in reliance on the representations, warranties and agreements set forth in this Agreement, at each Closing, (i) each Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from such Seller, all of such Seller's right, title and interest in and to the applicable portion of the Portfolio Property transferred at such Closing (other than any portion thereof that relates to the Excluded Interests) and (ii) Buyer agrees to assume and perform from and after the Closing, all of the duties, liabilities and obligations of such Seller under the Portfolio Property Agreements arising after the applicable Closing Date with respect to the Interest (including, without limitation, any

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

obligation of such Seller to make any further capital contributions to the Partnership from and after the Closing), provided, however, that Buyer shall not assume any Excluded Obligations.

**3.     Closing.**

(a)     Each Closing with respect to one or more Interests will take place on a Closing Date by exchange of executed documents via facsimile or email, or at such place as Buyer and Sellers may agree.  If any condition in Section 8 or 9 is not satisfied in any respect (or is not duly waived) at a Closing, the party whose obligations are subject to such condition may extend the applicable Closing Date, but not past the Final Closing Deadline (during which extension the other party shall use all reasonable efforts to cause all such conditions to be satisfied in all respects).   If all conditions are determined to be satisfied (or are duly waived) at such Closing (whether or not delayed), such Closing shall be consummated.

(b)     At least three (3) business days prior to each Closing, each applicable Seller shall deliver to Buyer a notice (a "**Pre-Closing Notice**") (i) specifying the Closing Date, and (ii) setting forth the Interest(s) to be transferred by such Seller on such Closing Date and the calculation of the applicable Allocated Portion of the Purchase Price of the Interest(s) to be transferred by such Seller on such Closing Date, including the aggregate amount of all Funded Capital Commitments and Distributions included in such determination as set forth in Section 4.  Notwithstanding the foregoing, following the delivery to Buyer of a Pre-Closing Notice, a Seller may, subject to the terms of this Agreement, postpone a Closing Date (but not later than the Final Closing Deadline) by delivering to Buyer prior to such Closing an updated Pre-Closing Notice that relates to one or more additional Interests to be transferred.

(c)     At each Closing, Buyer shall deliver to each applicable Seller: (i) the Allocated Portion of the Purchase Price relating to the Interests being transferred by such Seller, subject to adjustment in accordance with Section 4 and net of any withholding taxes attributable to the transfer or sale of the Interests, (ii) the certificates and other documents referred to in Section 8 to be delivered by Buyer as a condition to the consummation of the transactions contemplated under this Agreement, and (iii) if not theretofore delivered, all other instruments and documents required by the Partnerships to be delivered by Buyer as a condition to the consummation of the transactions contemplated under this Agreement.   The Purchase Price shall be paid in U.S. dollars in immediately available funds by wire transfer to the account designated by the applicable Seller in Schedule IV attached hereto.

(d)     At each Closing, each applicable Seller shall deliver or cause to be delivered to Buyer: (i) all applicable executed Assignment and Assumption Agreements and other Additional Seller's Documents pursuant to which such Seller shall convey the Interests it is transferring to Buyer, free and clear of all Liens, other than Investment Liens pertaining to Buyer and restrictions under federal and state securities laws, (ii) copies of all of the applicable Portfolio Property Agreements and other documents that constitute a part of the Interests to be transferred by such Seller at such Closing which have not previously been delivered by such Seller to Buyer, (iii) the certificates and other documents referred to in Section 9 to be delivered by such Seller as a condition to the consummation of the transactions contemplated under this Agreement, and (iv) such Approvals as required by Section 9(e).

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

(e)     Pursuant to the terms and conditions of this Agreement, and pursuant to the applicable Assignment and Assumption Agreements, at each Closing, Buyer shall assume the obligations and liabilities of each applicable Seller with respect to the Interests arising or otherwise outstanding on and after the applicable Closing Date under the Portfolio Property Agreements relating to the Portfolio Property purchased pursuant to this Agreement at such Closing, *provided* that Buyer is not, directly or indirectly, assuming, and shall not in any way be or become responsible for, and Sellers shall remain responsible for all Excluded Obligations.

**4.     Purchase Price.**

The purchase price for each Interest (with respect to any Interest, the "***Allocated Portion of the Purchase Price***" and with respect to all Interests, the "***Purchase Price***") shall be the amount set forth opposite the name of the relevant Partnership relating to such Interest on <u>Schedule I</u> under the heading "Purchase Price Allocation," adjusted as follows: (i) the Allocated Portion of the Purchase Price for each Interest shall be increased by an amount equal to the sum of all Funded Capital Commitments to the relevant Partnership attributable to such Interest, and (ii) the Allocated Portion of the Purchase Price of each Interest shall be reduced by an aggregate amount equal to the sum of all Distributions with respect to such Interest after the Cut Off Date and on or prior to the applicable Closing Date.  In the event that due to Distributions made with respect to an Interest after the Cut Off Date, but on or prior to the applicable Closing Date, the Allocated Portion of the Purchase Price for such Interest otherwise would be reduced below zero, any excess amount of such reduction shall be allocated pro rata to the other Interests (and to the extent that such other Allocated Portions of the Purchase Price are also reduced to zero, the applicable Seller shall promptly pay to Buyer the aggregate amount of such excess reduction).  If any Interest becomes a Liquidated Interest on or before the Final Closing Deadline, the Purchase Price shall be calculated as if the applicable Interest had been transferred to Buyer at and as of the Final Closing Deadline (or such earlier date as may be determined by the parties, the "<u>Liquidated Interest Transfer Date</u>").  From and after the Liquidated Interest Transfer Date, Buyer shall assume and agree to perform all of the applicable Seller's liabilities and obligations under the Portfolio Property Agreements with respect to each Liquidated Interest (excluding any Excluded Obligations), it being the parties' intention that the economic effect of Buyer's assumption of such liabilities and obligations shall be the same as if such Liquidated Interest was transferred to Buyer on and at the Liquidated Interest Transfer Date.  To the extent the parties discover after the Closing that the amount of Funded Capital Commitments and/or Distributions used in adjusting the Allocated Portion of the Purchase Price for an Interest was incorrect, such Allocated Portion of the Purchase Price will be appropriately adjusted to take into account the actual Funded Capital Commitments and/or Distributions in respect of such Interest (and the parties shall cooperate as necessary to correct the error).  Any disagreement as to the calculation of any Funded Capital Commitments and Distributions used to determine the Allocated Portion of the Purchase Price shall be subject to confirmation by the Manager of the Partnership of the calculation of such Funded Capital Commitments and Distributions. The parties agree in good faith to adjust the calculation of such Allocated Portion of the Purchase Price, as appropriate, prior to the relevant Closing to account for any Funded Capital Commitments paid and Distributions received between the date of a Pre-Closing Notice and the relevant Closing which become known to the applicable Seller or Buyer during such period.

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

**5.    Representations and Warranties of Sellers.**

Each Seller hereby represents and warrants, severally and not jointly, to Buyer, as of the date of this Agreement and as of each Closing Date, as follows:

(a)    <u>Authorization</u>.  Such Seller is an entity duly organized and validly existing in good standing under the laws of its jurisdiction of organization.  Such Seller has the requisite power and authority to enter into, execute and deliver this Agreement and each of the Additional Seller's Documents to which such Seller is a party, and to perform all of the obligations to be performed by such Seller hereunder and thereunder.  This Agreement and the transactions contemplated hereby have been, and each of the Additional Seller's Documents to which such Seller is a party will have been at the Closing, duly authorized, executed and delivered by it, and this Agreement constitutes, and each of the Additional Seller's Documents to which such Seller is a party will constitute at the Closing, its valid and binding obligation, enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally.

(b)    <u>Title to Interest</u>.  Such Seller owns all right, title and interests (legal and beneficial) in and to the applicable Portfolio Property (as set forth on <u>Schedule I and Schedule II</u>) as of the date hereof and as to each such Interest to be transferred to Buyer at the Closing and as of the Closing Date, free and clear of all Liens other than Investment Liens and restrictions under federal and state securities laws.  Such Seller was the original purchaser of the Interests from the Partnerships and has been the legal and beneficial owner of each Interest since that date.  Upon delivery of the applicable Interests to Buyer and payment to such Seller of the Allocated Portion of Purchase Price for such Interests, Buyer will acquire good and marketable title to such Interests free and clear of all Liens other than (i) Investment Liens pertaining to Buyer and restrictions under federal and state securities laws and (ii) any Liens created by Buyer.  Except with respect to any Excluded Interest, all of the Approvals will have been duly obtained or waived on or before the Closing Date, and, in the case of any rights of first refusal, will have been duly waived or all applicable notice periods will have expired without such rights having been exercised on or before the Closing Date, by all interested parties.

(c)    <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement or the Additional Seller's Documents, nor the performance or consummation of the transactions contemplated hereby or thereby by such Seller, will conflict with, result in the breach of, constitute a default under, or accelerate performance provided by the terms of: (i) any law, rule or regulation of any government or governmental or regulatory agency, or any judgment, order writ, decree, permit or license of any court or governmental or regulatory agency to which such Seller may be subject; (ii) subject to obtaining the Approvals of the Managers and/or Partnerships, any Portfolio Property Agreement, contract, agreement, commitment or instrument to which such Seller is a party or by which any of its assets are bound; or (iii) such Seller's constituent documents or other governing instruments (or constitute an event which, with the passage of time or action by a third party, would result in any of the foregoing).  The execution and delivery of this Agreement by such Seller and the performance and consummation of the transactions contemplated hereby do not require any registration, filing, qualification, consent or approval under any such law, rule, regulation, judgment, order, writ, decree, permit or license to which such Seller may be subject.

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

(d)     <u>Agreements and Commitments</u>.

(i)     Such Seller has furnished to Buyer true, correct and complete copies of all Portfolio Property Agreements relating to the Interests to be sold by such Seller, in each case in the form provided to such Seller by the applicable Manager.  <u>Schedule II</u> sets forth a list of the documents and agreements (including amendments and schedules thereto) that constitute the Portfolio Property Agreements and the Portfolio Contractual Rights with respect to such Seller. Such Seller will use commercially reasonable efforts to assist Buyer in obtaining any additional documents relating to such Interests.  Other than this Agreement and as set forth on <u>Schedule II</u>, such Seller is not a party to any contract, agreement or commitment with respect to any Interest.

(ii)     Such Seller has timely contributed to the capital of each applicable Partnership all amounts which it was required to contribute pursuant to the terms of the Portfolio Property Agreements. Such Seller has, indirectly through the applicable Partnerships, participated in each investment made by each applicable Partnership and has not opted out or been excluded, voluntarily or, to Seller's knowledge, involuntarily, from any investments of such Partnership pursuant to the terms of the Portfolio Property Agreements or otherwise.  Such Seller has paid all management fees due and payable by it pursuant to the terms of the relevant Portfolio Property Agreements, including all such fees through the Closing Date.  Such Seller has not made any voluntary capital contributions or written commitments to any Partnership nor have any been made on behalf of it.

(iii)     Such Seller (A) has not received written notice from any Manager that it is subject to a "clawback" obligation with respect any Distribution or portion of a Distribution previously received by it from any applicalbe Partnership, (B) is not in material default or breach, nor, is there any reasonable basis for any valid claim of material default or  breach, under any Portfolio Property Agreement and (C) has not elected to be treated as a "blocker partner" or participated in any underlying investment of a Partnership through an entity treated as a corporation for U.S. federal tax purposes and (D) has not participated in any underlying investment of a Partnership through any AIV except as noted on <u>Schedule II</u>.

(e)     <u>Litigation</u>.  There is no action, suit, claim, proceeding, arbitration, governmental inquiry or investigation or other action pending or, to such Seller's knowledge, threatened against such Seller, at law or in equity, before or by any governmental or regulatory department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if adversely determined, would question the validity of, or prevent or delay the consummation of, the transactions contemplated by this Agreement or adversely affect the Interests being transferred by such Seller pursuant to this Agreement.  There is no action or suit by such Seller pending or threatened against any other Person relating to the Interests or the Partnerships.

(f)     <u>Brokers</u>.  Except with respect to 8F Investment Partners, the fees and expenses of which shall be paid by Buyer, such Seller has not, directly, or indirectly, dealt with anyone acting in the capacity of a finder or broker, nor has such Seller incurred any obligations for any finder's or broker's fee or commission, in connection with the transactions contemplated by this Agreement.

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

(g)  <u>Employee Benefit Plan</u>.  Such Seller is not, and is not acting on behalf of, an employee benefit plan or "benefit plan investor" within the purview of ERISA.

(h)  <u>Lists of Distributions, Capital Commitment, etc</u>.  <u>Schedule I</u> and <u>Schedule III</u> contain true and accurate lists of:  (A) the Interests owned and being transferred by such Seller; (B) to the best of such Seller's knowledge based upon information provided by the Managers, the amount of the Capital Account Balance of such Seller in each Partnership with respect to each such Interest as of the Cut Off Date; (C) such Seller's total Capital Commitment to each such Partnership with respect to each such Interest; (D) such Seller's total Remaining Capital Commitment to each Partnership with respect to each such Interest as of the Cut Off Date; (E) if such Seller is realizing a loss on the sale of an Interest, such Seller's adjusted tax basis in such Interest as of the most recent year for which Seller has filed tax returns; (F) the Purchase Price Allocation for each Interest as of the Closing Date; (G) the date and value of all Distributions received by such Seller with respect to the Interests after the Cut Off Date and on or prior to the Closing Date; (H) a list of all distribution notices (including the dates and amounts of such distribution notices) received by or on behalf of such Seller from each Partnership relating to a Distribution to be received by such Seller after the Cut-Off Date; (I) all Funded Capital Commitments with respect to such Seller, showing the date and amount of each payment; and (J) all capital contributions to the applicable Partnerships that are due but not paid as of the Closing Date, and where applicable, the scheduled date and amount of each.  In the event that such Seller obtains actual knowledge of an inaccuracy or omission with respect to <u>Schedule I</u>, <u>Schedule II</u> or <u>Schedule III</u>, such Seller shall provide notice of such inaccuracy or omission to Buyer as soon as is reasonably practicable and in any event within thirty days after it obtains such knowledge.

(i)  <u>Certain Conduct</u>.  Such Seller has not (i) sold, assigned, transferred, delivered or otherwise disposed of any of the Portfolio Property which such Seller is transferring to Buyer; (ii) converted, exchanged or redeemed any of the Interests being transferred by such Seller pursuant to this Agreement; (iii) forgiven, released or compromised any indebtedness owed to it by any Partnership other than upon full payment thereof or demanded payment of any indebtedness owed to it by any Partnership in which such Seller has an Interest that is being transferred pursuant to this Agreement; (iv) amended, canceled or terminated any Portfolio Property Agreement or entered into any new Portfolio Property Agreement; (v) waived, amended, canceled, terminated, exercised or failed to exercise any of the material Portfolio Contractual Rights; (vi) created or permitted to exist any Lien on any portion of the Portfolio Property being transferred by such Seller pursuant to this Agreement, other than Investment Liens; (vii) taken any action or (upon notice from any Partnership) failed to take any action that would cause such Seller to incur a penalty or other specified consequence under any of the Portfolio Property Agreements; nor (viii) agreed to do any of the foregoing.

(j)  <u>Tax Matters</u>.  Such Seller has not elected to be treated as a "blocker partner" or participate in any underlying investment of a Partnership or AIV through an entity treated as a corporation for U.S. federal income tax purposes.  No Partnership or AIV in which such Seller holds an Interest is classified as a corporation for U.S. federal income tax purposes.

(k)  <u>Solvency</u>.  No transfer of any Interests is being made by such Seller with the intent to hinder, delay, or defraud either present or future creditors of such Seller

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

    (l)    <u>General Solicitation</u>.  Neither such Seller nor anyone acting on such Seller's behalf has offered to sell any Interest by means of any general solicitation or general advertising.

    (m)    <u>Anti-Money Laundering Matters</u>.  Neither such Seller nor, to the knowledge of such Seller, any of its beneficial owners appears on the Specifically Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**"), or is otherwise a party with which Buyer or any Partnership is prohibited from dealing under the laws of the United States.  Such Seller further represents and warrants that the monies used to fund the investment in the Interests being transferred by such Seller are, to the knowledge of such Seller, not derived from, invested for the benefit of, or related in any way to, the governments of, or persons within, any country (i) under a U.S. embargo enforced by OFAC, (ii) that has been designated as a "non-cooperative country or territory" by the Financial Action Task Force on Money Laundering, or (iii) that has been designated by the U.S. Secretary of the Treasury as a "primary money laundering concern."  Such Seller further represents and warrants that such Seller (A) has conducted due diligence with respect to all of its beneficial owners, (B) to its knowledge has established the identities of beneficial owners, and (C) will retain evidence of any such identities and any such due diligence in accordance with its compliance policies.  Such Seller further represents and warrants that such Seller does not know or have any reason to suspect that (i) the monies used to fund such Seller's investment in the Interests have been derived from or related to any illegal activities, including, but not limited to, money laundering activities and (ii) the proceeds from such Seller's investment in the Interests (including Buyer's purchase of the Interests) will be used to finance any illegal activities.

    (n)    <u>Disclosure</u>.  Such Seller is a sophisticated, experienced investor, capable of evaluating the value of the Interests, has made its own due diligence analysis in its decision to effect the sale of the Interests pursuant to this Agreement, and has not relied upon any representations, warranties, covenants, or agreements of Buyer other than those set forth in this Agreement.  Such Seller acknowledges that Buyer has no obligation to provide information to such Seller relating to the value of the Interests or otherwise, except as specified in this Agreement, and the aggregate Purchase Price for the Interests may be more or less than the fair market value of the Interests.  Such Seller acknowledges that Buyer may be in possession of material non-public information with respect to the Interests and hereby waives its right to rescind or invalidate the sale of the Interests to Buyer or to seek damages or other remuneration from Buyer based on Buyer's possession of such information or the lack of possession of any such information by such Seller.

**6.**    **Representations and Warranties of Buyer.**

    Buyer hereby represents and warrants to each Seller, as of the date of this Agreement and as of each Closing Date, as follows:

    (a)    <u>Authorization</u>.  Buyer is an entity, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.  Buyer has the requisite power and authority to enter into, execute and deliver this Agreement and each of the Additional Buyer's Documents, and to perform all of the obligations to be performed by it hereunder and thereunder. This Agreement has been, and each of the Additional Buyer's Documents will have been at the Closing, duly authorized, executed and delivered by it, and this Agreement constitutes, and each

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

of the Additional Buyer's Documents will constitute at the Closing, its valid and binding obligation, enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally.

(b) <u>No Conflicts</u>. Neither the execution and delivery of this Agreement or the Additional Buyer's Documents, nor the performance or consummation of the transactions contemplated hereby by Buyer, will conflict with, result in the breach of, constitute a default under or accelerate the performance required by the terms of: (i) any law, rule or regulation of any government or governmental or regulatory agency; (ii) any judgment, order, writ, decree, permit or license of any court or governmental or regulatory agency to which Buyer may be subject; (iii) any contract, agreement, commitment or instrument to which Buyer is a party or by which it or any of its assets is bound; or (iv) Buyer's constituent documents or other governing instruments (or constitute an event which, with the passage of time or action by a third party, would result in any of the foregoing). The execution and delivery of this Agreement by Buyer and the performance and consummation of the transactions contemplated hereby by Buyer do not require any registration, filing, qualification, consent or approval under any such law, rule, regulation, judgment, order, writ, decree, permit or license to which Buyer may be subject.

(c) <u>Acknowledgments</u>. Buyer is acquiring the Interests for Buyer's own account, for investment and not with a view to the distribution or resale thereof, except in compliance with the Act and applicable state securities laws. Buyer has such knowledge and experience in financial and business matters and in making investments of this type that it is capable of evaluating the merits and risks of purchasing the Interests. Buyer is an "accredited investor," as that term is defined in Rule 501(a) of Regulation D under the Act.

(d) <u>ERISA</u>. Buyer is not, and is not acting on behalf of, an employee benefit plan subject to Title I of ERISA or Section 4975 of the Code or any "benefit plan investor" as defined in 29 CFR 2510.3-101(f)(2), as modified by Section 3(42) of ERISA.

(e) <u>Litigation</u>. There is no action, suit, claim, proceeding, arbitration, governmental inquiry or investigation pending or, to Buyer's knowledge, threatened against Buyer, at law or in equity, before or by any governmental or regulatory department, commission, board, bureau, agency or instrumentality, domestic or foreign, which, if adversely determined, would question the validity of, or prevent or delay the consummation of, the transactions contemplated by this Agreement or Buyer's ability to perform its obligations hereunder or materially and adversely affects Buyer's ability to buy the Interests pursuant to this Agreement.

(f) <u>Brokers</u>. Except with respect to 8F Investment Partners, the fees and expenses of which shall be paid by Buyer, Buyer has not, directly or indirectly, dealt with anyone acting in the capacity of a finder or broker and has not incurred any obligations for any finder's or broker's fee or commission in connection with the transactions contemplated by this Agreement.

(g) <u>Anti-Money Laundering Matters</u>. Neither Buyer nor, to the knowledge of Buyer, any of its beneficial owners appears on the Specifically Designated Nationals and Blocked Persons List of OFAC, or is otherwise a party with which Sellers or any Partnership is prohibited from dealing under the laws of the United States. Buyer further represents and warrants that the monies

12

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

used to fund the investment in the Interests are, to the knowledge of Buyer, not derived from, invested for the benefit of, or related in any way to, the governments of, or persons within, any country (i) under a U.S. embargo enforced by OFAC, (ii) that has been designated as a "non-cooperative country or territory" by the Financial Action Task Force on Money Laundering, or (iii) that has been designated by the U.S. Secretary of the Treasury as a "primary money laundering concern." Buyer further represents and warrants that Buyer (A) has conducted due diligence with respect to all of its beneficial owners, (B) to its knowledge has established the identities of beneficial owners, and (C) will retain evidence of any such identities and any such due diligence in accordance with its compliance policies. Buyer further represents and warrants that Buyer does not know or have any reason to suspect that (i) the monies used to fund Buyer's investment in the Interests have been derived from or related to any illegal activities, including, but not limited to, money laundering activities and (ii) the proceeds from Buyer's investment in the Interests will be used to finance any illegal activities.

(h)     <u>Disclosure</u>.  Buyer is a sophisticated, experienced investor, capable of evaluating the value of the Interests, has made its own due diligence analysis in its decision to purchase the Interests pursuant to this Agreement, and has not relied upon any representations, warranties, covenants, or agreements of Sellers other than those set forth in this Agreement.  Buyer acknowledges that Sellers have no obligation to provide information to Buyer relating to the value of the Interests or otherwise, except as specified in this Agreement, and the aggregate Purchase Price for the Interests may be more or less than the fair market value of the Interests. Buyer acknowledges that Sellers may be in possession of material non-public information with respect to the Interests and hereby waives its right to rescind or invalidate the purchase of the Interests from Sellers or to seek damages or other remuneration from Sellers based on Sellers' possession of such information or the lack of possession of any such information by Buyer.

7.     **Covenants.**

(a)     <u>Cooperation</u>.

(i)     Buyer, on the one hand, and Sellers, on the other hand, shall cooperate fully with each other in furnishing any information or performing any action reasonably requested by the other party, which information or action is necessary to the timely and successful consummation of the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, (x) Sellers shall cooperate with Buyer to have the Partnerships provide Buyer with the opportunity to verify the Capital Account Balances of Sellers on the books of the Partnerships, and (y) the parties will work cooperatively together toward obtaining the Approvals.

(ii)     In the event that as a condition to obtaining the Approval of a Manager to the transfer of the Interests, such Manager requires a Seller and Buyer to jointly or jointly and severally indemnify, or for either party to solely indemnify, such Manager and/or the applicable Partnership in the Assignment and Assumption Agreement, such Seller and Buyer agree as follows:

(A)     each of Buyer and such Seller shall be liable for amounts owed under such indemnification provision that result from such party's acts or omissions (including any inaccuracy in or breach of any representation or warranty of such party contained in such

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

Assignment and Assumption Agreement or any failure by such party to perform any covenant, agreement or obligation of such party contained in such Assignment and Assumption Agreement); and

(B)     each of Buyer and such Seller shall be liable for 50% of any amounts owed under such indemnification provision that do not result from the acts or omissions of either party.

(b)     <u>Certain Matters Pending Final Closing</u>.  Each Seller agrees that from the date of this Agreement until the Final Closing:

(i)     *Certain Conduct Pending Final Closing*.  Such Seller shall (x) provide Buyer with prompt written notice of (1) any Distributions received or expected by such Seller after the Cut Off Date and on or prior to the applicable Closing Date with respect to any Interest to be transferred by such Seller pursuant to this Agreement and (2) any rights to take an action with respect to any Interest and (y) appoint a person designated by Buyer to act as such Seller's representative at any annual meeting of a Partnership to occur prior to the Closing for an applicable Interest. Except as consented to by Buyer in writing (such consent not to be unreasonably withheld or delayed), such Seller will not: (A) other than pursuant to the exercise of a right of first refusal pursuant to any of the Portfolio Property Agreements, dispose, liquidate, mortgage, sell, assign, transfer, deliver or solicit any bids for, or enter into any discussions with a prospective purchaser of the Interests to be transferred by such Seller pursuant to this Agreement; (B) consent to, amend, modify, cancel or terminate any of the Portfolio Property Agreements or the Portfolio Contractual Rights, in each case with respect to any of the Interests being sold by such Seller, or enter into any agreement relating thereto or to the Interests being sold by such Seller; (C) forgive, release, compromise or demand payment of any indebtedness owed to it by a Partnership other than upon full payment thereof; (D) fail in any manner to perform fully, or take any action or omit to take any action that would constitute a breach of, its obligations under any of the Portfolio Property Agreements or the Portfolio Contractual Rights, in each case with respect to any of the Interests being sold by such Seller hereunder; (E) make any voluntary capital contribution or fail to make any required capital contribution to any Partnership; (F) create or permit to exist any Lien on the Interests other than the Investment Liens and restrictions under federal and state securities laws; (G) take any action the effect of which would be to incur a penalty or other specified consequence under any of the Portfolio Property Agreements or the Portfolio Contractual Rights, including the conversion of all or a portion of the Interests to a fixed obligation, in each case with respect to any of the Interests being sold by such Seller hereunder; (H) take any action which would result in a reduction in such Seller's percentage of ownership in any of the Partnerships with respect to any Interest being sold by such Seller hereunder; (I) waive any material right with respect to any Interest; (J) elect to participate in any underlying investment other than through the applicable Partnership or an AIV treated as a partnership for U.S. federal income tax purposes or elect to participate through any "blocker entity" treated as a corporation for U.S. federal income tax purposes; or (K) agree to do any of the foregoing.

(ii)     *No Solicitation*.  Such Seller will not, and will cause its officers, directors, affiliates, agents and representatives not to, initiate contact with, solicit or otherwise discuss any inquiry or proposal by any other corporation, general or limited partnership, limited liability company, Person or other entity or group in connection with (A) any proposed sale or transfer of

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

any Interest, or (B) any similar transaction unless (x) required by the terms of the relevant Portfolio Property Agreement or any Portfolio Contractual Right, or (y) a Closing with respect to the such Interest has not occurred by the Final Closing Deadline.

(iii)   *No Rescinding of Authorization.*   Such Seller shall not rescind any authorizing action taken in connection with the transactions contemplated by this Agreement, nor shall such Seller take any other action materially inconsistent with this Agreement and the Additional Seller's Documents to which such Seller is a party.

(iv)   *Notices; Quarterly and Annual Reports.*   Each Seller shall give prompt notice to Buyer of the receipt by such Seller of (A) any notice or other communication relating to a default or event which, with notice or lapse of time or both, would become a default, under any of the Portfolio Property Agreements or the Portfolio Contractual Rights, in each case with respect to the applicable Interests being sold by such Seller hereunder, (B) any notice or other communication (including, without limitation, quarterly and annual reports of any Partnership, in each case with respect to the applicable Interests being sold by such Seller hereunder, or other financial statements or similar information) from or on behalf of such Partnership or any partner of such Partnership, (C) any notice or other communication relating to any contemplated or pending claim, action, suit, proceeding or investigation by any governmental department, commission, board, agency, instrumentality or authority involving or relating to a Partnership or an Interest, and (D) any matter which would cause any change with respect to any representation made in this Agreement. With respect to any such notice or other communication, such Seller shall inform Buyer of the receipt and substance thereof and, if in writing, shall promptly furnish Buyer with a copy thereof (including any related materials).

(v)   *Tax Matters.*   Sellers shall cooperate with Buyer in obtaining the agreement of each Manager to allocate income, gains, losses, deductions or credits attributable to each Interest for the tax year of such Partnership in which the Closing Date occurs between Buyer and the applicable Seller based upon an interim closing of such Partnership's books as of the effective date of the transfer.

(c)   AIVs.   If prior to the applicable Closing, Seller is treated as owning an AIV with respect to an Interest, that AIV shall be treated as part of and transferred with the corresponding Interest. Any AIV partnership or other operating agreements shall be deemed to be within the definition of Portfolio Property Agreement.

(d)   Return of Certain Distributions.   To the extent Buyer or a Seller is required to disgorge, in whole or in part, or otherwise reimburse, pay or return to a Partnership or any other Person any Distributions received by such Seller prior to the Cut Off Date, whether such return shall be effected by repayment, or by deduction from such Seller's or Buyer's capital account, or set-off against any subsequent distribution, or otherwise, then such Seller shall pay such amounts directly to such Partnership or Buyer, as the case may be, and such payment shall not be deemed to be a Funded Capital Commitment hereunder.

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

**8.      Conditions to Obligations of each Seller.**

The obligations of each Seller to consummate the transactions contemplated by this Agreement at each Closing are, at the option of such Seller, subject to each of the following conditions, and Buyer shall use all reasonable efforts to cause each such condition to be timely satisfied:

(a)      <u>Representations and Warranties</u>.  The representations and warranties of Buyer contained in this Agreement and in the Additional Buyer's Documents (i) that are not qualified by materiality (other than those set forth in Section 6(a)) shall be true and accurate in all material respects, and (ii) that are qualified as to materiality or that are set forth in Section 6(a)  shall be true and accurate in all respects, in each case as of the date when made and at and as of the Closing Date as though such representations and warranties were made at and as of the Closing Date, except to the extent that they expressly refer to an earlier or specific time, in which case they are true and correct in all material respects or all respects, as the case may be, as of such time.

(b)      <u>Performance</u>.  Buyer shall have performed in all material respects all agreements and obligations and complied with all conditions required by this Agreement to be performed or complied with by Buyer at or prior to the applicable Closing.

(c)      <u>Legal Proceedings</u>.  No statute, law regulation, judgment or order of any nature issued by a court of competent jurisdiction or government authority restraining, prohibiting or affecting the consummation of the transactions contemplated by this Agreement shall be in effect, and no claim, suit, action, investigation, inquiry or other proceeding by any government body or other Person shall be pending or threatened which questions the validity or legality of the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that the provisions of this Section 8(c) shall not apply if such Seller has directly or indirectly solicited or encouraged any such action, suit, claim, proceeding, arbitration, governmental inquiry or investigation.

(d)      <u>Certificate</u>.  Buyer shall have furnished such Seller with a certificate, the form of which is attached as <u>Exhibit A</u>, dated as of the applicable Closing Date and signed by an authorized signatory of Buyer to the effect that Buyer has performed and complied with the conditions set forth in Sections 8(a) and 8(b) above.

(e)      <u>Approvals</u>.  All Approvals required to permit the transfer and assignment to Buyer of the applicable Portfolio Property relating to the Interests to be transferred at the applicable Closing shall have been obtained and any other consents and approvals required to be obtained by Buyer from any court, governmental agency, creditor or any other Person for the execution, delivery and performance of this Agreement and the Additional Buyer's Documents on the part of Buyer with respect to such Interests shall have been obtained.

(f)      <u>Delivery of Purchase Price</u>.  Buyer shall have delivered the adjusted Allocated Portion of the Purchase Price to such Seller in the manner described in Section 4 with respect to the Interests being sold by such Seller at the applicable Closing.

(g)      <u>Delivery of Assignment and Assumption Agreements</u>.  The Assignment and Assumption Agreements with respect to the Interests being purchased by Buyer from such Seller at the applicable Closing shall be in form and substance acceptable to such Seller, acting

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

reasonably, and shall have been executed by Buyer (and by the Manager of each Partnership that is required to execute any such agreements) and delivered by Buyer to such Seller.

9.    **Conditions to Obligations of Buyer.**

The obligations of Buyer to consummate the transactions contemplated by this Agreement at each Closing are, at the option of Buyer, subject to each of the following conditions, and each Seller shall use all reasonable efforts to cause each such condition to be timely satisfied:

(a)    <u>Representations and Warranties</u>.  The representations and warranties of such Seller contained in this Agreement and in the Additional Seller's Documents to which such Seller is a party (i) that are not qualified by materiality (other than those set forth in Sections 5(a) and 5(b)) shall be true and accurate in all material respects, and (ii) that are qualified as to materiality or that are set forth in Section 5(a) or 5(b) shall be true and accurate in all respects, in each case as of the date when made and at and as of the Closing Date (as modified by any Pre-Closing Notice) as though such representations and warranties were made at and as of the Closing Date, except to the extent that they expressly refer to an earlier or specific time, in which case they are true and correct in all material respects or all respects, as the case may be, as of such time.

(b)    <u>Performance</u>.  Such Seller shall have performed in all material respects all agreements and obligations and complied with all conditions required by this Agreement to be performed or complied with by such Seller at or prior to the applicable Closing.

(c)    <u>Legal Proceedings</u>.  No statute, law regulation, judgment or order of any nature issued by a court of competent jurisdiction or government authority restraining, prohibiting or affecting the transactions contemplated by this Agreement shall be in effect, and no claim, suit, action, investigation, inquiry or other proceeding by any governmental body or other Person shall be pending or threatened which questions the validity or legality of the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that the provisions of this Section 9(c) shall not apply if Buyer has directly or indirectly solicited or encouraged any such action, suit, claim, proceeding, arbitration, governmental inquiry or investigation.

(d)    <u>Certificates</u>.

(i)    Such Seller shall have furnished Buyer with a certificate, the form of which is attached as <u>Exhibit B</u>, dated as of the applicable Closing Date and signed by an authorized signatory of Seller to the effect that such Seller has performed and complied with the conditions set forth in Sections 9(a) and 9(b) above and that all of the Approvals with respect to the Interests such Seller is transferring have been obtained.

(ii)    Such Seller shall have furnished Buyer with a certificate in a form attached as <u>Exhibit C</u> hereto, dated as of the applicable Closing Date and signed by an authorized signatory.

(e)    <u>Approvals</u>.  All Approvals required to permit the transfer and assignment to Buyer of the applicable Portfolio Property relating to the Interests to be transferred at the applicable Closing shall have been obtained and any other consents and approvals required to be obtained by such Seller from any court, governmental agency, creditor or any other Person for the execution,

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

delivery and performance of this Agreement and the Additional Seller's Documents on the part of such Seller shall have been obtained.

(f)     Delivery of Assignment and Assumption Agreements.  The Assignment and Assumption Agreements with respect to the Interests being purchased by Buyer from such Seller at the applicable Closing shall be in form and substance acceptable to Buyer, acting reasonably, and shall have been executed by such Seller (and by the Manager of each Partnership that is required to execute any such agreements) and delivered by such Seller to Buyer.

(g)     Delivery of Schedules.  With respect to each Interest to be transferred by such Seller, Seller shall deliver to Buyer on or prior to the applicable Closing Date an amended Schedule I (solely as to the columns related to Distributions and Funded Capital Commitments after the Cut Off Date, as well as the calculation of the net adjusted Purchase Price) and Schedule III updated to reflect any changes from the date of this Agreement through and including such Closing Date, to be verified with the respective Managers of the Partnerships prior to such Closing Date.

**10.     Survival of Representations and Warranties.**

Each and every representation and warranty in this Agreement, the Schedules to it, the Additional Seller's Documents and the Additional Buyer's Documents shall survive the applicable Closing and shall be fully effective and enforceable for a period of two (2) years from such Closing Date, except that the representations and warranties contained in Sections 5(a), 5(b), 5(f), 6(a) and 6(f) shall survive until the expiration of the applicable statute of limitations thereto.  Any investigation or other examination that may be made at any time by or on behalf of a party to which representations and warranties are made shall not limit, diminish or in any way affect the specific representations and warranties in this Agreement, and the parties may rely on the specific representations and warranties in this Agreement, irrespective of any information obtained by them by any investigation, examination or otherwise.  All rights to indemnification with respect to any representation and warranty hereunder shall survive only as long as the applicable representation and warranty survives; *provided, however,* that with respect to any claim for indemnification asserted by notice in writing from the non-breaching party to the breaching party, in good faith and with reasonable details (to the extent known at that time) prior to the termination of the representation or warranty, the parties' indemnification obligations shall survive until the claim is resolved.

**11.     Indemnification.**

(a)     Indemnification by Sellers.  Each Seller agrees, severally and not jointly, to defend, indemnify and hold harmless Buyer, its affiliates and their respective partners, employees, officers, directors, members, managers, agents, successors and assigns (collectively, the "**Buyer Indemnitees**") from and against any and all losses, damages, claims, suits, proceedings, liabilities, costs, fees and expenses (including settlement costs, interest, penalties, reasonable attorneys' fees and any reasonable legal or other expenses for investigation or defense of any actions or threatened actions) and any economic detriment of any kind (collectively, "**Losses**" or "**Claims**," as the context requires) which may be imposed, sustained, incurred or suffered or asserted as a result of, relating to or arising out of (i) any inaccuracy in or breach of any representation or warranty of such Seller contained in this Agreement or the Additional Seller's Documents to which such Seller

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

is a party, (ii) any failure by such Seller to perform any covenant, agreement or obligation of such Seller contained in this Agreement or the Additional Seller's Documents to which such Seller is a party (unless waived in writing by Buyer at or prior to the applicable Closing Date), (iii) any claim by any Person, other than 8F Investment Partners. with whom or which such Seller has, directly or indirectly, dealt for any finder's or broker's fee or commission in connection with the transactions contemplated by this Agreement, (iv) any liability, obligation or claim that may be made with respect to any Excluded Interest (if any), (v) any Excluded Obligations, (vi) any claim by any Person entitled to indemnification pursuant to the terms of any agreement pursuant to which an Interest is transferred, which claim relates to a misrepresentation by such Seller or a breach or violation of any warranty, covenant or other obligation of such Seller, (vii) any Transfer Taxes to be paid by such Seller herein, and (viii) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.

(b)     <u>Indemnification by Buyer</u>.  Buyer agrees to defend, indemnify and hold harmless each Seller, its affiliates and their respective partners, employees, officers, directors, members, managers, agents, successors and assigns (collectively, the "***Seller Indemnitees***") from and against any and all Losses and Claims which may be imposed, sustained, incurred or suffered or asserted as a result of, relating to or arising out of (i) any inaccuracy in or breach of any representation or warranty of Buyer contained in this Agreement or the Additional Buyer's Documents, (ii) any failure by Buyer to perform any covenant, agreement or obligation of Buyer contained in this Agreement or in the Additional Buyer's Documents (unless specifically waived in writing by such Seller at or prior to the applicable Closing), (iii) any and all liabilities specifically assumed by Buyer pursuant to Section 3(e) of this Agreement, (iv) any claim by any Person, including 8F Investment Partners. with whom or which Buyer has, directly or indirectly, dealt for any finder's or broker's fee or commission in connection with the transactions contemplated by this Agreement, (v) any claim by any Person entitled to indemnification pursuant to the terms of any agreement pursuant to which an Interest is transferred, which claim relates to a misrepresentation by Buyer or a breach or violation of any warranty, covenant or other obligation of Buyer, and (vi) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing.

(c)     <u>Limitations on Indemnification</u>.

(i)     <u>Sellers</u>.  Notwithstanding anything in Section 11(a) to the contrary, the maximum amount payable by a Seller to Buyer for Losses in respect of claims made by Buyer for indemnification with respect to the breach of any representations or warranties of such Seller hereunder shall not exceed the Purchase Price paid to such Seller; *provided, however,* that Buyer shall not be subject to any limitation pursuant to this Section 11(c)(i) or otherwise, and shall be entitled to dollar-for-dollar recovery from such Seller, for Losses in connection with (x) fraud, intentional misrepresentation or a deliberate or willful breach by such Seller of any of its representations and warranties under this Agreement, (y) the breach by such Seller of any of the representations or warranties contained in Section 5(a), Section 5(b) or Section 5(f), or (z) any indemnification obligations of such Seller pursuant to Section 11(a)(v).

(ii)     <u>Buyer</u>.  Notwithstanding anything in Section 11(b) to the contrary, the maximum amount payable by Buyer to a Seller for Losses in respect of claims made by such Seller

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

for indemnification hereunder shall not exceed the Purchase Price payable to such Seller; *provided, however,* that such Seller shall not be subject to any limitation pursuant to this Section 11(c)(ii) or otherwise, and shall be entitled to dollar-for-dollar recovery from Buyer, for Losses in connection with, (x) fraud, intentional misrepresentation or a deliberate or willful breach by Buyer of any of its representations and warranties under this Agreement or (y) breach by Buyer of any of the representations or warranties contained in Section 6(a) or Section 6(f).

     (d)    <u>Procedure for Third Party Claims</u>.

     (i)    If a Person entitled to assert a claim for indemnification under this Agreement shall receive notice of the assertion by any Person not a party to this Agreement of any claim or of the commencement of any action or proceeding (a "***Third Party Claim***") with respect to which either a Seller or Buyer is obligated to provide indemnification, the indemnified party (the "***Indemnitee***") shall give the indemnifying party (the "***Indemnitor***") prompt written notice after becoming aware of such Third Party Claim. The failure of the Indemnitee to give notice as provided in this Section 11(d)(i) shall not relieve the Indemnitor of its obligations for indemnification under this Agreement, except to the extent that the failure has materially and adversely affected the rights of the Indemnitor. The notice from the Indemnitee shall describe the Third Party Claim in reasonable detail.

     (ii)    An Indemnitor may elect to compromise or defend, at the Indemnitor's own expense and by the Indemnitor's own counsel, any Third Party Claim. If an Indemnitor elects to compromise or defend a Third Party Claim, it shall, within thirty (30) days (or sooner, if the nature of the Third Party Claim so requires), notify the Indemnitee of its intent to do so, and the Indemnitee shall cooperate in the compromise of, or defense against, the Third Party Claim. The Indemnitor shall pay the Indemnitee's actual out-of-pocket expenses incurred in connection with its cooperation. After notice from an Indemnitor to an Indemnitee of its election to assume the defense of a Third Party Claim, the Indemnitor shall not be liable to the Indemnitee under this Agreement for any legal expenses subsequently incurred by the Indemnitee in connection with defense of the Third Party Claim; *provided* that Indemnitee shall have the right to employ one counsel in each applicable jurisdiction (if more than one jurisdiction is involved) to represent Indemnitee if, in the Indemnitee's reasonable judgment, a conflict of interest between the Indemnitee and the Indemnitor exists in respect of such Third Party Claim, and in that event the fees and expenses of such separate counsel shall be paid by the Indemnitor. If an Indemnitor elects not to defend against a Third Party Claim, or fails to notify an Indemnitee of its election as provided in this Section 11(d)(ii), the Indemnitee may pay, compromise or defend such Third Party Claim on behalf of, and for the account and risk of, the Indemnitor. No Indemnitor shall consent to entry of any judgment or enter into any settlement, except with the written consent of each affected Indemnitee (which consent shall not be unreasonably withheld), if such judgment or settlement provides for anything other than money damages or other money payments for which the Indemnitee is entitled to indemnification under this Agreement or which does not contain as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnitee of a release from all liability in respect of the Third Party Claim.

     (iii)    If there is a reasonable likelihood that a Third Party Claim may materially and adversely affect an Indemnitee, other than as a result of money damages or other money payments for which the Indemnitee is entitled to indemnification hereunder, the Indemnitee will

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

have the right, after consultation with the Indemnitor and at the cost and expense of the Indemnitor, to assume the defense of the Third Party Claim in lieu of the Indemnitor with counsel reasonably acceptable to the Indemnitor.

(e)  <u>Reduction of Claim or Loss</u>.  If the amount of any Claim or Loss shall, at any time subsequent to payment pursuant to this Section 11, be reduced by recovery, settlement or otherwise, the amount of such reduction, less any expenses incurred in connection therewith, shall promptly be repaid by the Indemnitee to the related Indemnitor.

(f)  <u>Remedies Exclusive</u>.  Subject to Section 16(l), the remedies provided in this Section 11 shall be the sole and exclusive remedy against a party for Losses, *provided however*, that notwithstanding the foregoing, nothing in this Section 11(f) shall limit in any way any remedy at law or equity to which a party may be entitled as a result of fraud or intentional misrepresentation or deliberate and willful breach by the other party of any of their representations and warranties under this Agreement, the Schedules to it, the Additional Seller's Documents or the Additional Buyer's Documents, as appropriate.

## 12.  Confidentiality.

(a)  All information furnished in writing by either party to this Agreement to the other party to this Agreement in connection with this Agreement and the transactions contemplated by it shall be kept confidential by the receiving party and shall be used by the receiving party only in connection with this Agreement and the transactions contemplated hereby, except with the specific prior written consent of the disclosing party or to the extent that such information (i) is information which the receiving party can demonstrate was already known to the receiving party when received, (ii) at the time of disclosure or thereafter becomes lawfully obtainable from other sources through no act or failure to act on the part of the receiving party, (iii) is required to be disclosed in any document to be filed with any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or in connection with any litigation; (iv) is disclosed in connection with any consultation with attorneys, accountants, employees, or other advisors retained in connection with the transactions contemplated hereby under an obligation to keep such information confidential, (v) is required to be disclosed by court order or otherwise mandated by law; <u>provided</u> that, in each case, the receiving party shall disclose only so much of the confidential information as is legally required, or (vi) is disclosed by a Seller or Buyer, as applicable, to its investors or potential investors, as applicable; <u>provided</u>, that such disclosure is made on a confidential basis.  The parties shall use their respective commercially reasonable efforts and establish reasonable precautions to ensure that their principals, agents and employees abide by the terms of this Section 12.

(b)  Without the prior consent of Buyer, neither Seller will, and without the prior consent of Sellers, Buyer will not, disclose the terms of this Agreement (including, without limitation, the Purchase Price or any Allocated Portion of the Purchase Price) or the transactions contemplated hereunder, nor the identity of the parties hereto, to any Person, including the Managers, except that such disclosure may be made (i) to a party's officers, directors, partners, advisors and employees who require such information for the purpose of consummating the transactions contemplated by this Agreement, (ii) as required by law and (iii) pursuant to Section 12(a)(vi) of this Agreement.  Notwithstanding the prior sentence, (x) the identity of the parties

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

hereto may be provided by either party to the Managers in connection with obtaining the Approvals without the consent of the other party and (y) Buyer and Sellers will cooperate with each other to make any necessary disclosure (A) to the partners of the Partnerships in connection with any right of first refusal under the Portfolio Property Agreements and (B) to the Managers in connection with obtaining the Approvals.

Notwithstanding the provisions in Sections 12(a) and 12(b) above, Sellers agree that Buyer is itself a fund of funds having reporting obligations to its underlying investors and may provide to its actual and prospective investors the terms of this Agreement (including, without limitation, the Purchase Price) and the transactions contemplated hereunder; *provided* that, the Buyer shall not disclose the identity of Sellers to such Persons.

(c)     Notwithstanding anything in this Agreement to the contrary, to avoid the application of Treasury Regulations Section 1.6011-4(b)(3), the parties to this Agreement may disclose to any and all Persons, without limitation of any kind, the U.S. federal tax treatment and tax structure of the transactions contemplated by this Agreement.

## 13.     Nonassignable Interests.

If the sale, assignment or transfer of any portion of the Portfolio Property, or a request for permission to sell, assign or transfer such portion of the Portfolio Property, pursuant to the relevant Portfolio Property Agreement would require the consent of any other party, then this Agreement shall not constitute a contract to assign such Portfolio Property, or such effected part thereof, until such time as such consent has been received to the extent that an attempted assignment without such consent would (i) constitute a breach of the relevant Portfolio Property Agreement, (ii) create rights in others not desired by the applicable Seller or Buyer, or (iii) create rights in third parties against a Seller.  The parties shall cooperate and use all reasonable efforts to procure all Approvals which may be required in order to assign the Portfolio Property and to admit Buyer as a substitute limited partner of each of the Partnerships.

## 14.     Termination.

(a)     <u>By Mutual Consent</u>.  This Agreement may be terminated and the transactions contemplated by it abandoned, with respect to any Interest not transferred to Buyer prior to such termination, at any time prior to the Final Closing for any reason pursuant to the mutual written consent of Buyer and Sellers, and Buyer shall have no further obligation to buy and Sellers shall have no further obligation to sell any Interests not purchased by Buyer prior to such termination of this Agreement.

(b)     <u>By Buyer or Sellers</u>.  This Agreement may be terminated, and the transactions contemplated by it abandoned, with respect to any Interest not transferred to Buyer prior to such termination, by written notice from Buyer to Sellers, or from Sellers to Buyer, (i) in the event of a material breach by a Seller or Buyer, respectively, of any representation, warranty, covenant or agreement contained in this Agreement which cannot be or is not cured within ten (10) days (a "*Cure Period*") after written notice of the breach is given to the party committing the breach; or (ii) if the Final Closing does not occur on or before the Final Closing Deadline (or such later date as may be agreed upon in writing by Buyer and Sellers); <u>provided</u>, <u>however</u>, that the right to

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

terminate this Agreement under the foregoing clause (i) shall not be available to a party if that party is itself in material breach of any representation, warranty, covenant or agreement given by it in this Agreement; and <u>provided</u> <u>further</u>, that the right to terminate this Agreement under the foregoing clause (ii) shall not be available to a party if such party's breach of this Agreement has been the cause of or resulted in the failure of the Final Closing to occur on or before the Final Closing Deadline, it being understood and agreed that a failure to satisfy any of the conditions set forth in Sections 8(c) and 9(c) shall not be deemed a "breach or failure to fulfill any obligation" by any party.

(c)     <u>Survival</u>. If this Agreement is terminated, no party to this Agreement will have any liability or further obligation to the other party pursuant to this Agreement with respect to any Interests that have not been transferred to Buyer; <u>provided</u>, <u>however</u>, that the agreements of Sellers and Buyer contained in Sections 12 and 16(a) shall survive such termination; and <u>provided</u>, <u>further</u>, that if termination results from the bad faith, intentional misrepresentation or willful breach of a party, such party will remain liable for any and all costs, expenses, damages incurred or suffered by the other party as a direct result of such failure or breach; and <u>provided</u>, <u>further</u>, that nothing herein shall affect the rights and obligations of the parties with respect to any and all Interests that have been sold to Buyer prior to such termination.

**15.     Post-Closing Covenants.**

(a)     <u>Notices</u>.  After any Closing, each Seller shall promptly forward to Buyer any correspondence, notices or Distributions (in cash or otherwise) received by such Seller or any affiliated entity that relate to the Portfolio Property purchased by Buyer hereunder.  Each Seller shall remit any Distributions in cash, securities, or other property pursuant to the preceding sentence to Buyer within ten (10) business days after receipt by such Seller.  If a Seller fails to remit any Distributions in cash, securities or other property pursuant to the preceding sentence to the Buyer within 10 Business Days after receipt by such Seller, in addition to any other rights and remedies Buyer may have, Buyer may assess interest at eight and one-half percent (8-1/2%) per annum, compounded annually, on the unpaid amount commencing on such 10th Business Day.

(b)     <u>Tax Information</u>.  In the event any Partnership is an "electing investment partnership" under Section 743(e)(6) of the Code, Sellers will comply with all applicable laws in providing information to Buyer with respect to each such applicable Partnership in which it owns an Interest.  Such information shall be furnished in compliance with the requirements of IRS Notice 2005-32 or superseding guidance issued by the Internal Revenue Service.

(c)     <u>Access to and Retention of Records</u>.  Buyer and Sellers agree that all books and records retained by each party which relate to the Interests shall be open for inspection by representatives of the other party at any time during regular business hours (upon reasonable advance notice) for a period of three (3) years (or such longer period as is required by applicable law) from the date of preparation or compilation of such books, records, documents or materials and that the other party may during such period at its expense make such copies or excerpts therefrom as it may reasonably request in order to comply with legal, audit or tax obligations or otherwise.  For a period of three (3) years following the Final Closing, no party shall destroy or give up possession of any original or final copy of any of the books and records relating to the Interests reasonably required in the preparation of tax, regulatory and other governmental

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

compliance matters, without first offering the other party the opportunity to obtain such original or final copy or a copy thereof.

**16. General Provisions.**

(a) <u>Expenses</u>. All fees and expenses incurred in connection with this Agreement (and the transactions contemplated hereunder), including all fees of counsel, brokers, finders and accountants, shall be borne by the party incurring the same. Notwithstanding the foregoing, Buyer, on the one hand, and Sellers, on the other hand, shall share equally all attorneys' and accountants' fees of the Managers and Partnerships payable as a result of the transfer of the Portfolio Property or any part thereof, as well as any other expenses requested to be paid by any Partnership with respect to the transfer of any Portfolio Property (including any accounting, tax preparation or other administrative expenses incurred (or to be incurred) by a Partnership and charged to Buyer or a Seller as a result of tax basis adjustments under Section 743 of the Code or related provisions related to the transfer of the Interests). All Transfer Taxes incurred in connection with the consummation of the transactions contemplated by this Agreement shall be borne equally (50:50) by Sellers, on the one hand, and Buyer, on the other hand. Subject to applicable law, any tax returns that must be filed with respect to Transfer Taxes shall be prepared and filed when due by the applicable party, with the cooperation of the other party if necessary.

(b) <u>Notices</u>. All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given and received when delivered by hand or courier, when received by facsimile transmission, or three (3) days after the date when posted by air mail, with postage prepaid, addressed as follows:

(i) If to Sellers, to:

HRH Khaled bin Sultan bin Abdulaziz Al Saud
348 Muhammad Bin Abdulaziz Al Saud Street
Riyadh, Kingdom of Saudi Arabia

with a copy to (which shall not constitute notice):

Decisive Wealth
Attn: Elie Chamat/ Maryam Hakimi
Rue du Rhone 78
1204 Geneva

or to such other Person or address as Sellers shall furnish to Buyer in writing.

(ii) If to Buyer, to:

Kline Hill Partners
125 Mason Street, Floor 1
Attn: Danielle Buccola
Fax No. (475) 299-9465

with a copy to (which shall not constitute notice):

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

Graber Law Group
19 Princeton Road
Wellesley, MA  02482
Attn:  Matthew Graber
Email:  matt@graberlawgroup.com

or to such other Person or address as Buyer shall furnish to Sellers in writing.

(c)  <u>Assignment</u>.  This Agreement and all of its provisions shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.  This Agreement may not be assigned without the prior written consent of each of the parties hereto.

(d)  <u>Governing Law</u>.  This Agreement and the legal relations among the parties shall be governed by and construed in accordance with the laws of the State of New York without reference to the conflicts of laws principles thereof.

(e)  <u>Counterparts</u>.  This Agreement may be executed in two or more identical counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Facsimile or other electronic signatures shall be deemed acceptable and binding.

(f)  <u>Interpretation</u>.  The headings of the Sections and subsections of this Agreement are inserted for convenience only and shall not constitute a part of or affect in any way the meaning or interpretation of this Agreement. The words "include," "includes" and "including" when used in this Agreement shall be deemed in each case to be followed by the words "without limitation." Defined terms used in this Agreement shall have the same meaning whether defined or used herein in the singular or the plural, as the case may be.

(g)  <u>Entire Agreement</u>.  This Agreement, including the Schedules to this Agreement, and the other documents and certificates delivered pursuant to the terms of this Agreement, sets forth the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersede all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of any party, including, without limitation, any confidentiality agreement entered into by a Seller or Buyer or their respective agents or affiliates in respect of the transactions contemplated herein.

(h)  <u>Amendment: Waiver</u>.  This Agreement may be amended only by a written instrument executed by Sellers and Buyer; <u>provided</u>, <u>however</u>, that amendments to <u>Schedule I</u>, <u>Schedule II</u> or <u>Schedule III</u> effected pursuant to this Agreement shall not require such a writing. Any failure of Buyer to comply with any obligation, agreement or condition under this Agreement may only be waived in writing by Sellers, and any such failure by a Seller may only be waived in writing by Buyer, but any such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  No failure by a party to take any action against any breach of this Agreement or default by the other party shall constitute a waiver of such party's right to enforce any provision of this Agreement or to take any such action.

25

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

(i)  **Third Parties.**  Except as provided in Section 11(a) and Section 11(b) with respect to indemnification obligations of Sellers and Buyer for the benefit of the Seller Indemnitees and the Buyer Indemnitees, nothing in this Agreement, expressed or implied, is intended, or shall be construed, to confer upon or give to any Person or entity other than the parties and their successors or assigns, any rights or remedies under or by reason of this Agreement.

(j)  **Publicity.**  Except as may otherwise be required by law, no publicity release or announcement concerning this Agreement or the transactions contemplated by this Agreement shall be made by either party without the prior written consent of the other party.

(k)  **Additional Documents and Acts.**  Each of the parties agrees to execute and deliver such additional documents, certificates and instruments, and to perform such additional acts, as may be reasonably requested and as may be necessary or appropriate to carry out the provisions of this Agreement and to consummate the transactions contemplated by this Agreement.

(l)  **Specific Performance.**  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions (or other equitable relief) to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in any court, in addition to any other remedy to which they are entitled at law or in equity. The parties hereby waive, in any action for specific performance, the defense of adequacy of a remedy at law and the posting of any bond or other security in connection therewith.  No failure or delay by any party hereto in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

(m)  **Resolution of Conflicts.**  In the event of any inconsistency or conflict between the terms and provisions of this Agreement and the terms and provisions of any document executed by Buyer and/or a Seller in connection with obtaining the Approvals, the terms and provisions of this Agreement shall control as between Buyer and such Seller, notwithstanding any agreement Buyer or such Seller may have jointly or separately with a Manager or a Partnership.

(n)  **No Presumption Regarding Drafting.**  Each of Buyer and Sellers acknowledge that it has reviewed this Agreement prior to its execution and that changes were made to this Agreement based upon its comments. If any disputes arise with respect to the interpretation of any provision of this Agreement, the provision shall be deemed to have been drafted by both of the parties and shall not be construed against any party on the basis that the party was responsible for drafting that provision.

(o)  **Severability.**  If any term, provision, agreement, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party hereto. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a reasonably acceptable manner in order that the transactions

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

contemplated hereby may be consummated as originally contemplated to the fullest extent possible.

(p)     <u>Waiver of Jury Trial</u>.  Each of the parties hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any litigation as between the parties directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby or disputes relating thereto.  Each of the parties (i) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this agreement by, among other things, the mutual waivers and certifications in this Section 16(p).

**[Remainder of Page Intentionally Left Blank]**

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

IN WITNESS WHEREOF, the parties have executed this Agreement of Purchase and Sale, acting by their duly authorized agents, as of the date first above written.

SELLERS:                                    BUYER:

**HRH Khaled Bin Sultan Bin  Abdulaziz Al Saud**        **KLINE HILL PARTNERS FUND II LP**

By: KHP Fund GP II LLC
Its: General Partner

By:_____          By:_____
Name: HRH Khaled Bin Sultan Bin Abdulaziz        Name: Michael A. Bego
Al Saud                                 Title: Managing Member


**Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled**


By:_____
Name: HRH Khaled Bin Sultan Bin Abdulaziz
Al Saud

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

IN WITNESS WHEREOF, the parties have executed this Agreement of Purchase and Sale, acting by their duly authorized agents, as of the date first above written.

SELLERS:                                              BUYER:

**HRH Khaled Bin Sultan Bin  Abdulaziz Al Saud**          **KLINE HILL PARTNERS FUND II LP**

By: KHP Fund GP II LLC
Its: General Partner

By:_____          By: _____
Name: HRH Khaled Bin Sultan Bin Abdulaziz          Name: Michael A. Bego
Al Saud                                              Title: Managing Member


**Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled**

By:_____
Name: HRH Khaled Bin Sultan Bin Abdulaziz
Al Saud

Case 3:20-cv-00351-SVN   Document 20-3   Filed 03/13/20   Page 31 of 39

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

Schedule I

_TM_

| Name of Seller | Name of Partnership | Capital Commitment | Capital Account Balance (as of Cut Off Date) | Remaining Capital Commitment (as of the Cut Off Date) | Allocated Portion of the Purchase Price (as of the Cut Off Date) | Distributions after the Cut Off Date | Funded Capital Commitments after the Cut Off Date | Net Purchase Price Allocation |
|---|---|---|---|---|---|---|---|---|
| HRH Khaled Bin Sultan Bin Abdulaziz Al Saud | Secondary Opportunities Fund III Private Client Feeder Fund. L.P. | $5,000,000 | $2,520,757 | $2,721,959 | $1,850,000 | $424,089 | $1,469,936 | $2,895,847 |
| Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled | Secondary Opportunities Fund III Private Client Feeder Fund. L.P. | $5,000,000 | $2,520,757 | $2,721,959 | $1,850,000 | $424,089 | $1,469,936 | $2,895,847 |
| **Total:** | | **$10,000,000** | **$5,041,514** | **$5,443,918** | **$3,700,000** | **$848,178** | **$2,939,872** | **$5,791,694** |

*Indicate "Gain" if a taxable gain is being recognized on the sale of an Interest.

[Purchase Price Allocations to be confirmed prior to each Closing Date]

Case 3:20-cv-00551-VLB   Document 20-3   Filed 03/13/20   Page 33 of 39

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

## Schedule II

### List of Portfolio Contractual Rights (if any)

### List of Portfolio Property Agreements

|    | Entity | Portfolio Property Agreements |
|----|--------|-------------------------------|
| 1. |        |                               |
| 2. |        |                               |
| 3. |        |                               |
| 4. |        |                               |
| 5. |        |                               |

### Description of AIVs

Case 3:20-cv-00351-VLB Document 20-3 Filed 03/13/20 Page 34 of 39

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

## Schedule III

### Distributions of the Partnerships After the Cut Off Date (sorted by Partnership)

| Seller | Partnership | Date | Description of Distribution | Value |
|---|---|---|---|---|
| HRH Khaled Bin Sultan Bin Abdulaziz AlSaud | Secondary Opportunities Fund III Private Client Feeder Fund, L.P. | 1/28/18 | | $424,089 |
| Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled | Secondary Opportunities Fund III Private Client Feeder Fund, L.P. | 1/28/18 | | $424,089 |
| | | | | |
| | | | | |

### Notices of Distributions to be made after the Cut Off Date
### (which have not yet been made, sorted by Partnership)

| Seller | Partnership | Date | Description of Distribution | Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

Schedule III Continued

Funded Capital Commitments to the Partnerships (After the Cut Off Date)

| Seller | Partnership | Date | Description of Distribution | Value |
|---|---|---|---|---|
| HRH Khaled Bin Sultan Bin Abdulaziz Al Saud | Secondary Opportunities Fund III Private Client Feeder Fund, L.P. | 10/27/17 | | $1,291,556 |
| Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled | Secondary Opportunities Fund III Private Client Feeder Fund, L.P. | 10/27/17 | | $1,291,556 |
| HRH Khaled Bin Sultan Bin Abdulaziz Al Saud | Secondary Opportunities Fund III Private Client Feeder Fund, L.P. | 2/22/17 | | $178,380 |
| Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled | Secondary Opportunities Fund III Private Client Feeder Fund, L.P. | 2/22/17 | | $178,380 |

Schedule III Continued

Capital Contributions Due But Not Paid as of the applicable Closing Date

| Seller | Partnership | Date | Description of Distribution | Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Case 3:20-cv-00551-VLB   Document 20-3   Filed 03/13/20   Page 36 of 39

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

<u>Schedule IV</u>

<u>Sellers' Wire Instructions</u>

| | |
|---|---|
| Name of Bank: | Societe General Private Bank (SUISSE) SA |
| Address of Bank: | Rue du Rhone 8, CH 1211 Geneva 11, Switzerland |
| ABA #: | <u>RUEGCHZZ</u> |
| Account #: | ███████████ |
| Account Name: | AL Saud H.R.H. Prince K. |

| | |
|---|---|
| Name of Bank: | Societe Generate Private Banking (Suisse) SA |
| Address of Bank: | Rue du Rhone 8, CH 1211 Geneva 11, Switzerland |
| ABA #: | <u>RUEGCHZZ</u> |
| Account #: | ███████████ |
| Acount Name: | K/F/F/A/A/N/A/J/L/L/J AL SAUD |

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

**Exhibit A**

**Buyer Closing Certificate**

This Certificate is delivered pursuant to Section 8(d) of the Agreement of Purchase and Sale dated as of April 27, 2018 (the "*Agreement*"), by and among and HRH Khaled Bin Sultan Bin Abdulaziz Al Saud, and Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled, (each a "*Seller*" and, together, the "*Sellers*"), and Kline Hill Partners Fund II LP ("*Buyer*").  Unless otherwise defined herein, all capitalized terms shall have the meaning given to them in the Agreement.

Buyer hereby certifies to each Seller that:

(a)      the representations and warranties of Buyer to Sellers contained in the Agreement and in the Additional Buyer's Documents (i) that are not qualified by materiality (other than those set forth in Section 6(a) of the Agreement) are true and accurate in all material respects, and (ii) that are qualified as to materiality or that are set forth in Section 6(a) of the Agreement are true and accurate in all respects, in each case as of the date when made and at and as of the date hereof as though such representations and warranties were made at and as of the date hereof, except to the extent that they expressly refer to an earlier or specific time, in which case they are true and correct in all material respects or all respects, as the case may be, as of such time; and

(b)      Buyer has performed in all material respects all agreements and obligations and complied with all conditions required by the Agreement to be performed or complied with by Buyer at or prior to the Closing occurring on the date hereof.

IN WITNESS WHEREOF, Buyer has caused this Certificate to be executed on its behalf by the undersigned as of _____ __, 201[_].


**KLINE HILL PARTNERS FUND II LP**
By:  KHP FUND GP II LLC


By: _____
Name:_____
Title: _____

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

**Exhibit B**

**Seller Closing Certificate**

This Certificate is delivered pursuant to Section 8(d) of the Agreement of Purchase and Sale dated as of April 27, 2018 (the "*Agreement*"), by and among and HRH Khaled Bin Sultan Bin Abdulaziz Al Saud, and Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled, (each a "*Seller*" and, together, the "*Sellers*"), and Kline Hill Partners Fund II LP ("*Buyer*"). Unless otherwise defined herein, all capitalized terms shall have the meaning given to them in the Agreement.

Seller hereby certifies to Buyer that:

(a) the representations and warranties of Seller to Buyer contained in the Agreement and in the Additional Seller's Documents to which such Seller is a party (i) that are not qualified by materiality (other than those set forth in Sections 5(a) and 5(b) of the Agreement) are true and accurate in all material respects, and (ii) that are qualified as to materiality or that are set forth in Section 5(a) or 5(b) of the Agreement are true and accurate in all respects, in each case as of the date when made and at and as of the date hereof (as modified by any Pre-Closing Notice) as though such representations and warranties were made at and as of the date hereof, except to the extent that they expressly refer to an earlier or specific time, in which case they are true and correct in all material respects or all respects, as the case may be, as of such time;

(b) Seller has performed in all material respects all agreements and obligations and complied with all conditions required by the Agreement to be performed or complied with by Seller at or prior to the Closing occurring on the date hereof; and

(c) all of the Approvals with respect to the Interests Seller is transferring on the date hereof have been obtained.

IN WITNESS WHEREOF, Seller has caused this Certificate to be executed on its behalf by the undersigned as of _____ __, 201[_].

**[SELLER]**

By: _____

Name:_____

Title: _____

DocuSign Envelope ID: F3EDA19F-63A1-46B2-82A2-F9B02E998069

## Exhibit C

### Certification of Non-Foreign Status

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a buyer of a U.S. real property interest must withhold tax if the seller is a foreign person. Section 1446(f) of the Code, as amended by Section 13501(b) of the Tax Cuts and Job Act of 2017, requires a transferee to deduct and withhold tax on a disposition of an interest in a partnership by a foreign partner if any gain from a disposition of such interest would be treated as "effectively connected with the conduct of a trade or business within the United States" within the meaning of Section 864 of the Code.   For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.  To inform Kline Hill Partners Fund II LP (the "Buyer") that withholding of tax is not required upon the disposition of a U.S. real property interest or an interest in a partnership by [_____] (the "Seller"), the Seller certifies the following:

1. The Seller is not a foreign person within the meaning of Treas. Reg. Section 1.1445-2(b)(2)(i);

2. The Seller is not a disregarded entity within the meaning of Treas. Reg. Section 1.1445-2(b)(2)(iii);

3. The Seller's U.S. taxpayer identification number is [_____]; and

4. The Seller's address is:

   [_____]

The Seller understands that this certification may be disclosed to the U.S. Internal Revenue Service by the Buyer, and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, the undersigned declares that he/she has examined this certification and to the best of his/her knowledge and belief it is true, correct and complete, and the undersigned further declares that he/she has authority to sign this certification on behalf of the Seller.

Dated: _____

**HRH Khaled Bin Sultan Bin Abdulaziz Al Saud**

**By:** _____

**Name: HRH Khaled Bin Sultan Bin Abdulaziz Al Saud**

**Estate of the late HRH Princess M.B.A.B.M.A.S. acting through HRH Prince Khaled**

**By:** _____

**Name: HRH Khaled Bin Sultan Bin Abdulaziz Al Saud**